# EXHIBIT A

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| LAWRENCE N. CHERRY and JUDY G. CHERRY, husband and wife,<br><br>  Plaintiffs,<br><br>       vs.<br><br>UNITED STATES OF AMERICA; JOHN DOES AND JANE DOES I THROUGH X,<br><br>  Defendants. | No. 2:15-cv-00236-PGR |

DEPOSITION OF BOAZ M. RABIN, M.D.

Tucson, Arizona
October 2, 2015
10:18 a.m.

(COPY)

Prepared by:

FOLDY REPORTING
MICHAELA H. DAVIS, RPR, CRR
Certified Reporter
Certificate #50574

1   one that deals with medical negligence, carelessness, lack
2   of skill and so forth.  Can you give me an idea of how
3   many of the disability applications that you review are
4   being reviewed for that, to make that determination?
5               MR. SMART:  Objection to form.
6               You can answer if you understand.
7               THE WITNESS:  No, I didn't quite understand.  If
8   you can rephrase.
9               MR. SMART:  I might offer -- I think it's called
10  a Compensation and Pension Exam, so that might be an
11  easier way to use that terminology.
12  BY MR. CURTIN:
13      Q.    Okay.  Of the compensation and pension exams
14  that you do, how many of them or what percentage of them
15  are directed at the issue of whether the patient's
16  disability is caused by negligence of the VA provider?
17      A.    If I understand correctly, you ask me how many
18  1151 cases I do?
19      Q.    Yeah.
20      A.    Oh.  One to two a month.  And I've been doing
21  them since, I don't know, 2000, 2002 period, something
22  like this.
23      Q.    Could I leave a couple of my business cards with
24  you or --
25      A.    I'm a government employee.

```
 1                THE WITNESS:  Yes, sir.
 2   BY MR. CURTIN:
 3        Q.   And in this case, some of the care that you were
 4   evaluating as far as the VA personnel involved was
 5   dermatology care; correct?
 6        A.   Yes.  I believe this is the case, yes.
 7        Q.   And the point I was starting with was do you
 8   know how it is determined that you are qualified to
 9   evaluate the carelessness, negligence, lack of skill,
10   error in judgment, or other fault on the part of a
11   dermatologist?
12                MR. SMART:  Objection; form and foundation.
13                You can answer if you understand the question.
14                THE WITNESS:  How am I qualified?
15   BY MR. CURTIN:
16        Q.   No, the question is actually, who determines
17   that you're qualified?
18                MR. SMART:  Same objection.
19   BY MR. CURTIN:
20        Q.   If you know.
21        A.   I would have to say my superior and boss, for
22   lack of a better word.  My department director, Dr. Allen
23   Fraulick(phonetic).
24        Q.   If you felt uncomfortable in making a
25   determination regarding fault in a dermatology case, is
```

1  there a mechanism by which you could have consulted a
2  dermatologist?
3           MR. SMART:  Objection; form, foundation.  And
4  are you asking generally, or are you asking here what he
5  thought?
6           MR. CURTIN:  I'm just asking whether that
7  mechanism exists.
8  BY MR. CURTIN:
9      Q.   If you feel uncomfortable in evaluating the
10 fault of a specialist, is there a mechanism available by
11 which you can find an equivalent specialist to provide
12 input to you?
13     A.   I'll break the answer to that into two.  One is
14 the regulations.  By VA regulations, I cannot do cases
15 which pertain to mental health; or to vision, eye problems
16 in general; or to hearing, audiology.  By VA regulations,
17 those cases have to be dealt by the applicable expert.  If
18 I get -- and I did, I'm sure over the years, I don't
19 remember details, but there were cases that were so out of
20 my base of knowledge, experience, I can always -- I
21 will -- when I was in New York, I was the chief, so I
22 would refer it to the appropriate expert.  Here I'll tell
23 my boss that, you know, I cannot do this, for the sake of
24 the discussion, neurosurgical case because I have not done
25 any of it.  I have no idea.  It hasn't been in my

1  experience, et cetera, et cetera. So yes, there is a
2  mechanism.
3  BY MR. CURTIN:
4     Q.   Did you consult any outside expert in this case?
5          MR. SMART: You can answer that question.
6          THE WITNESS: I did not.
7  BY MR. CURTIN:
8     Q.   Okay. You were comfortable with -- I take it
9  you felt that you could adequately evaluate this case
10 without input from a board certified dermatologist?
11         MR. SMART: Objection. I'm going to instruct
12 the witness not to answer. It calls for his opinion about
13 his analysis of the case and mental processes privilege.
14 So I'm instructing him not to answer that question.
15         MR. CURTIN: I'll object that that lacks
16 foundation. He's a federal employee; you have to make a
17 preliminary showing that he has mental processes.
18         MR. SMART: Are you done?
19         MR. CURTIN: Okay.
20         MR. SMART: I've instructed him not to answer,
21 so...
22         MR. CURTIN: Nobody likes my jokes.
23 BY MR. CURTIN:
24    Q.   Did you consult any medical literature in
25 Mr. Cherry's case, if you recall?

1      A.   I do not recall the particulars of this case,
2 but when I sit down as part of the general algorithm as
3 how I do cases, I do consult literature of databases,
4 websites that are available. And over the years, I've
5 learned to work with them, trust them, and use them.
6      Q.   Now, I see from Exhibit Number 1 that you
7 reviewed VA medical records pertaining to Mr. Cherry's
8 dermatology care; correct?
9      A.   I reviewed his entire care. And as you would
10 see in Exhibit A, page 74, that's SOAZVA 78, in evidence
11 review, I note that evidence, yes, was reviewed, and the
12 caption says "c file tabbed." "C file" means the paper
13 folder, actually the original paper folder that the elves
14 or whomever may have delivered, was available to me.
15     Q.   And if you'll look at page SOAZVA 86, there's a
16 listing of materials that are potentially relevant
17 evidence.
18          Do you see that?
19     A.   I do. And --
20          MR. SMART: Let him ask you a question.
21 BY MR. CURTIN:
22     Q.   Are those all materials that you reviewed, or
23 are they merely materials that you had available to you?
24     A.   I don't remember the exact details. However,
25 based on my work experience, I have -- I tend to look at

1   require you to speculate, is that something you would note
2   in your report?
3           MR. SMART:  Generally?
4           MR. CURTIN:  Yes.
5           THE WITNESS:  Generally.  It is important to
6   pass the mere speculation, meaning there's only
7   speculation.  If there's only speculation to guide, this
8   is an inability to form a valid opinion or an opinion of
9   validity.  However, if there is data, knowledge,
10  scientific evidence, call it what you may, available where
11  you can make a -- I wouldn't call it a leap of faith, but
12  you can make a bit of an extrapolation that is not mere
13  speculation that is within realm of valid opinion.
14  Obviously, in medicine there's not 2-plus-2-equals-4
15  validity.  Just doesn't exist.  But you can get close to
16  it, or you can get very far from such validity.  That's
17  the thing.  If it's based on just speculation, it's not a
18  valid opinion.
19  BY MR. CURTIN:
20      Q.   Okay.  If you feel like you can't form an
21  opinion that's not speculative, do you put that in your
22  report, was, I think, my question.
23      A.   Yes.  If the opinion requested, they asked me a
24  question, I cannot answer it by anything but mere only
25  speculation, I'll put it down.  I'll say, "I cannot render

1  a valid opinion here."

2     Q.   So the opinions that you put down are opinions
3  that you feel are factually based and supported by
4  evidence?

5          MR. SMART:  Objection to form.  Basically just
6  generally that's his view?

7          THE WITNESS:  Can you reread me the question,
8  please?

9          (The record was read.)

10         THE WITNESS:  Yes.  Not -- as I said, the
11 validity is never a certainty.  It can be -- and I would
12 put that this is -- we have specific language to deal with
13 those things.  We'll put it "as likely as not," "less
14 likely than not," "most probably," "improbable," yes.  I
15 try to put the facts and evidence and knowledge first and
16 foremost, and then move from there to try and establish an
17 opinion of -- a good answer to the question I'm being
18 asked.

19 BY MR. CURTIN:

20    Q.   Okay.  And is that language then that you put
21 into the report if you feel something is less probable
22 than not?

23         I don't even know what that means.  Never mind.
24         If you feel something is as probable as not, is
25 that language you would put in your report?