ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

ADAM R. SMART (NC Bar No. 31797)
KATHERINE R. BRANCH (AZ Bar No. 025128)
Assistant U.S. Attorneys
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona  85004
Telephone:  602-514-7500
Facsimile:   602-514-7760
Email: Adam.Smart@usdoj.gov
         Katherine.Branch@usdoj.gov
*Attorneys for the United States of America*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lawrence N. Cherry and Judy G. Cherry, husband and wife, | CV 15-00236-PHX-ROS |
| Plaintiffs, | **INDEX OF EXHIBITS TO DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION IN LIMINE RE: QUALIFICATIONS OF STANDARD OF CARE EXPERTS** |
| v. | |
| United States of America; John Does and Jane Does I through X, | |
| Defendants. | |

| Ex. | Exhibit Description |
|---|---|
| A | Dr. Reardon's Deposition Excerpts |
| B | Physician Assistant Steven Carbonniere's Deposition Excerpts |

# EXHIBIT A

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Lawrence N. Cherry and Judy G.    )
Cherry, husband and wife,         )
                                  )
                Plaintiffs,       )
                                  )
    vs.                           )No. 2:15-cv-00236-PGR
                                  )
United States of America; et al., )
                                  )
                Defendants.       )
_____)


DEPOSITION OF CHRISTOPHER REARDON, M.D.


Phoenix, Arizona
August 14, 2015
9:26 a.m.


FOLDY REPORTING
4032 N. Miller Rd., Ste. 100
Scottsdale, AZ  85251
480.699.8002
Registered Reporting Firm R1004


Prepared by:
Leslie Foldy, RMR, CRR
Certified Court Reporter 50041


Prepared for:

(Copy)

 1

 2              DEPOSITION OF CHRISTOPHER REARDON, M.D.,

 3     Taken on August 14, 2015, commencing at 9:26 a.m., at the

 4     offices of Robbins & Curtin, Phoenix, Arizona, before

 5     Leslie J. Foldy, Arizona Certified Court Reporter No.

 6     50041.

 7

 8     APPEARANCES:

 9         For the Plaintiffs:

10             John M. Curtin, Esq.
               Robbins & Curtin
11             301 East Bethany Home Road, Suite B-100
               Phoenix, AZ  85012
12             john@robbinsandcurtin.com

13         For the Defendants:

14             Adam R. Smart, Esq.
               United States Attorney's Office
15             40 North Central Avenue, Suite 1200
               Phoenix, AZ  85004
16             adam.smart@usdoj.gov

17

18

19

20

21

22

23

24

25

1                    CHRISTOPHER REARDON, M.D.,

2      a witness herein, having been first duly sworn by Leslie

3      Foldy, Arizona Certified Court Reporter No. 50041, to

4      speak the truth and nothing but the truth, was examined

5      and testified as follows:

6

7                         EXAMINATION

8

9      BY MR. CURTIN:

10         Q.   Good morning.  Could you state your full name

11     and spell it for the record, please?

12         A.   Christopher Lee Reardon.

13         Q.   You are a medical doctor?

14         A.   Yes.

15         Q.   Have you ever had your deposition taken before?

16         A.   No.

17         Q.   A couple of things we need to do to get a good

18     transcript.

19              First of all, I need you to give me verbal

20     responses, not gestures, nods and shakes of the head --

21         A.   Right.

22         Q.   -- and other things that don't show up in the

23     transcript.

24              Secondly, I'll ask you to avoid uh-huh and

25     huh-uh.  I'll understand what you mean, but they look

1      A.    Laterally?

2      Q.    Yes.

3      A.    Yes.

4      Q.    That would depend on the lesion being

5   essentially raised above the skin level, wouldn't it?

6      A.    No.

7      Q.    Could the lesion extend under the skin?

8      A.    Squamous cell carcinoma in situ doesn't do that.

9      Q.    Okay.  But we don't know at this point whether

10  it's invasive or squamous cell carcinoma in situ, do we?

11     A.    Based on my clinical observation of having seen

12  these lesions for my whole career, this looks like a

13  squamous cell carcinoma in situ, and that's all that

14  that -- you know, that's all that it looks like.  Plus

15  there is no induration underneath it to indicate there is

16  more there with palpation.  There is no change in the

17  surface contracting it.  There is nothing going on

18  underneath this lesion clinically.

19     Q.    Clinically.  But we know from the pathology that

20  the deep margins are involved?

21     A.    That's true.

22     Q.    Okay.  So at this point invasive squamous cell

23  carcinoma is on the differential, isn't it?

24     A.    Very low on the differential.

25     Q.    Okay.  Well, would it be reasonable and prudent

```
 1   at this time for a dermatologist to attempt to determine

 2   whether or not there is invasive squamous cell carcinoma?

 3                    MR. SMART:  Objection, foundation.

 4                    Go ahead.

 5                    THE WITNESS:  Based on my long -- my long

 6   experience with these lesions, observing them clinically,

 7   there is no -- there is nothing there to indicate that

 8   there is some invasive component.

 9   BY MR. CURTIN:

10      Q.   Okay.  You've agreed with me that invasive

11   squamous cell carcinoma is on the differential, so what

12   I'm asking you is, when --

13                    Let me ask it as an abstract question.

14                    When invasive squamous cell carcinoma is on the

15   differential, is it reasonable and prudent for a

16   dermatologist to attempt to define whether or not there

17   is, in fact, invasive carcinoma or not?

18      A.   If there is invasive carcinoma, you would see

19   that clinically because it grows vertically, it grows up

20   and it grows down.  I'm not seeing that.  The biopsy only

21   basically confirmed what my clinical diagnosis was.

22      Q.   Okay.  What the biopsy says is that upon

23   completion of the biopsy, there is squamous cell

24   carcinoma left behind, true --

25                    MR. SMART:  Objection, form, foundation.
```

1    Maybe I can make it simpler.

2             Are you telling me that there is nothing in this

3    biopsy report that would require a reasonable and prudent

4    dermatologist to evaluate the patient for invasive

5    squamous cell carcinoma?

6                   MR. SMART:  Objection again, form,

7    foundation, speculation.

8                   THE WITNESS:  It depends.

9    BY MR. CURTIN:

10       Q.   Okay.  What does it depend on?

11       A.   If you really weren't sure what the lesion was,

12   you would biopsy it again.  But if you were pretty sure

13   with your clinical judgment what it was, you wouldn't

14   need to biopsy it again.

15       Q.   Okay.  Who was it that was making the decision

16   at this point whether to biopsy it again?  Was it you?

17       A.   I believe we talked about it.

18       Q.   Okay.  So at this point, your best recollection

19   is that Mr. Carbonniere came to you, talked to you about

20   the biopsy results, indicated that the margins were

21   positive, and you approved his treatment plan of two

22   weeks of Efudex.  Is that your testimony?

23       A.   I think we talked about -- we talked about -- we

24   talked about using Efudex.  I didn't tell him a time.

25       Q.   Did he tell you what he proposed to do?

```
 1      A.    No.

 2      Q.    Okay.  So rather than Mr. Carbonniere deciding

 3   whether or not to do a second biopsy, you made that

 4   decision?

 5      A.    I believe so.

 6      Q.    Okay.  And you were sure that your clinical

 7   impression of squamous cell carcinoma was confirmed by

 8   this biopsy?

 9              MR. SMART:  Objection, foundation.

10   BY MR. CURTIN:

11      Q.    Is that your testimony?

12              MR. SMART:  Objection again.

13   BY MR. CURTIN:

14      Q.    Go ahead.

15              MR. SMART:  Can you repeat the question so

16   he can hear the terminology you just used?

17              MR. CURTIN:  Sure.

18              (Record read as follows:

19                QUESTION:  And you were sure that

20          your clinical impression of squamous cell

21          carcinoma was confirmed by this biopsy?)

22   BY MR. CURTIN:

23      Q.    Okay.  He's right.  I'll fix that.

24              You were sure at this point that your clinical

25   impression of squamous cell carcinoma in situ had been
```

1   confirmed by this biopsy?

2        A.   Yes.

3        Q.   And you were, therefore, confident that a second

4   biopsy was unnecessary?

5        A.   Yes.

6        Q.   And you were sure that this was not invasive

7   squamous cell carcinoma?

8        A.   There were no signs of vertical growth, yes.

9        Q.   And you were also sure that there was no need

10  for a urology consult?

11            MR. SMART:  At this time?

12  BY MR. CURTIN:

13       Q.   At this time.

14       A.   Not at this time.

15       Q.   Okay.  Because you were confident that there had

16  been no invasion of the mucosa of the meatus?

17       A.   The meatus looked normal.

18       Q.   And in your experience, it's obvious to visual

19  inspection if a meatus has been invaded?

20       A.   It's at the tip of it.

21            MR. SMART:  John, when you get to a point,

22  I'd like to take a break.  I won't interrupt your time

23  here, but when we get to a point that works.

24            MR. CURTIN:  All right.

25  /  /

```
 1              BE IT KNOWN that the foregoing proceedings
       were taken before me; that the witness before testifying
 2     was duly sworn by me to testify to the whole truth; that
       the questions propounded to the witness and the answers
 3     of the witness thereto were taken down by me in shorthand
       and thereafter reduced to typewriting under my direction;
 4     that the foregoing is a true and correct transcript of
       all proceedings had upon the taking of said deposition,
 5     all done to the best of my skill and ability.

 6              I CERTIFY that I am in no way related to any
       of the parties hereto nor am I in any way interested in
 7     the outcome hereof.

 8         [x]  Review and signature was requested.
           [ ]  Review and signature was waived.
 9         [ ]  Review and signature was not requested.

10              I CERTIFY that I have complied with the ethical
       obligations in ACJA Sections (J)(1)(g)(1) and (2).
11

12

13

14

15     _____
       Leslie J. Foldy
16     Arizona Certified Reporter 50041

17
                I CERTIFY that this Registered Reporting Firm
18     has complied with the ethical obligations in ACJA
       Sections (J)(1)(g)(1) and (2).
19

20

21

22

23     _____
       Foldy Reporting
24     Arizona Registered Reporting Firm R1004

25
```

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Lawrence N. Cherry and Judy G.     )
Cherry, husband and wife,          )
                                   )
                    Plaintiffs,    )
                                   )
      vs.                          ) No. 2:15-cv-00236-PGR
                                   )
United States of America; et al.,) 
                                   )
                    Defendants.    )
_____)


DEPOSITION OF STEVEN CARBONNIERE, PA


Phoenix, Arizona
August 28, 2015
1:04 p.m.


FOLDY REPORTING
4032 N. Miller Rd., Ste. 100
Scottsdale, AZ  85251
480.699.8002
Registered Reporting Firm R1004


Prepared by:
Leslie Foldy, RMR, CRR
Certified Court Reporter 50041


Prepared for:

(Copy)

**Steven Carbonniere, PA**                     8/28/2015
**Cherry v. United States**

1              DEPOSITION OF STEVEN CARBONNIERE, PA,

2     Taken on August 28, 2015, commencing at 1:04 p.m., at the

3     offices of Robbins & Curtin, Phoenix. Arizona, before

4     Leslie J. Foldy, Arizona Certified Court Reporter No.

5     50041.

6

7     APPEARANCES:

8         For the Plaintiffs:

9              John M. Curtin, Esq.

               Robbins & Curtin

10             301 East Bethany Home Road, Suite B-100

               Phoenix, AZ  85012

11             john@robbinsandcurtin.com

12        For the Defendants:

13             Adam R. Smart, Esq.

               United States Attorney's Office

14             40 North Central Avenue, Suite 1200

               Phoenix, AZ  85004

15             adam.smart@usdoj.gov

16

17

18

19

20

21

22

23

24

25

1           STEVEN CARBONNIERE, PA,

2   a witness herein, having been first duly sworn by Leslie

3   Foldy, Arizona Certified Court Reporter No. 50041, to

4   speak the truth and nothing but the truth, was examined

5   and testified as follows:

6

7                   EXAMINATION

8

9   BY MR. CURTIN:

10      Q.   State your name for the record, please.

11      A.   Steven Wayne Carbonniere.

12      Q.   "car-bon-YAIR"?  I've been calling you

13   "car-bon-YAIR-ree" for --

14      A.   A lot of people think it's Italian, but it's

15   French.

16      Q.   Okay.  Carbonniere.

17           Have you ever had your deposition taken before?

18      A.   No.

19      Q.   Okay.  There is a couple rules that we have to

20   follow primarily directed at getting a good transcript.

21   The first one is I need you to give me verbal responses,

22   yes and no, instead of nods and shakes of the head.

23   Okay?

24      A.   Got it.

25      Q.   All right.  Second thing is, uh-huh and huh-uh

1     Q.    Now, how did you determine whether or not it was
2     invading the meatus?

3     A.    With the dermatoscope.

4     Q.    What's a dermatoscope?

5     A.    It's a 10x, high-quality scope used to examine
6     skin findings.

7     Q.    Okay.  So you're essentially looking at it with
8     a magnifying device?

9     A.    Correct.

10    Q.    Did you insert the magnifying device past the
11    initial sphincter of the penis?

12    A.    No.

13    Q.    Did you insert it into the meatus?

14    A.    No.

15    Q.    So you just examined it, the exterior?

16    A.    Well, I opened it up and looked very carefully
17    at the mucosa inside.

18    Q.    I see.  So you kind of squeezed the tip of the
19    penis and focused your device, magnifying device in the
20    opening?

21    A.    Yes.

22    Q.    And is that lighted?

23    A.    Yes.

24    Q.    Now, Dr. Reardon I think has since testified
25    that your description of the lesion was incorrect.

Steven Carbonniere, PA          8/28/2015
Cherry v. United States

1       A.    I think he's correct.

2       Q.    Did he tell you that in 2010?

3       A.    Not that I recall.

4       Q.    It says biopsy is offered, but client is not

5    willing.

6             Do you recall that discussion?

7       A.    I do.

8       Q.    Tell me what you recall about that discussion.

9       A.    That I told him that this looked like a cancer

10   and that a biopsy would be definitive --

11            Hold on one second.  Okay.

12            -- but he didn't want a biopsy.

13      Q.    Do you recall anything else about that

14   discussion?

15      A.    No.

16      Q.    Was Dr. Reardon present for that discussion?

17      A.    I don't remember.

18      Q.    Do you remember if he participated in that

19   discussion at all?

20      A.    Not specifically.

21      Q.    Okay.  Now, you felt this was likely early

22   squamous cell carcinoma on the tip of the penis; correct?

23      A.    Yes.

24      Q.    What is meant by early squamous cell carcinoma?

25      A.    Noninvasive.

1      Q.   Now, were you able to come to a definitive
2  opinion as to whether or not this was an invasive lesion
3  based on your visual inspection and inspection with the
4  dermatoscope?
5      A.   Well, after discussing the case with
6  Dr. Reardon, yes, because he -- we discussed the fact
7  that it was indeed a macule and not raised, and since it
8  wasn't raised, there is no vertical growth, so in situ is
9  the most likely diagnosis.
10     Q.   Okay.  If Dr. Reardon told you in 2010 that this
11  was a macule as opposed to a lesion that you've
12  described, can you tell me why you didn't correct the
13  record?
14     A.   Well, I don't remember exactly when I discussed
15  macule versus papule.  I don't recall that.  But
16  subsequently we discussed it in depth afterwards and the
17  treatment options.
18     Q.   Okay.  At what point in Mr. Cherry's treatment
19  do you think you discussed the difference between a
20  papule and a macule?
21     A.   I don't know exactly.  Sometime in between
22  seeing him and the end of the day.
23     Q.   Okay.  So that same day you would have known
24  that your description of this as a papule, which as I
25  understand is a raised lesion --

**Steven Carbonniere, PA**          8/28/2015
**Cherry v. United States**

1     A.   Correct.

2     Q.   Now, it appears that your proposed form of

3  treatment was Efudex twice a day to the penis for two

4  weeks followed by desonide.  Is that correct?

5     A.   Yes.

6     Q.   What is Efudex?

7     A.   It's 5-fluorouracil.  It's a chemotherapeutic

8  drug.

9     Q.   And desonide is what?

10    A.   Steroid.

11    Q.   What was your basis for prescribing two weeks of

12  Efudex?

13    A.   It's a standard therapy that we use for an in

14  situ squamous cell carcinomas.

15    Q.   Where did you learn that protocol?

16    A.   At the VA.

17    Q.   Who taught that to you?

18    A.   Multiple practitioners there use that same

19  criteria for treatment.

20    Q.   Did you tell Dr. Reardon that you were

21  prescribing Efudex for two weeks?

22    A.   Well, I don't remember if he -- if I told him

23  what I was going to prescribe, but we discussed it, and

24  that's why it was prescribed.

25    Q.   I'm sorry.  I'm not getting the distinction

1    you're drawing.

2         A.    Well, the choice of therapy was not mine; it was

3    his.

4         Q.    Okay.  So did Dr. Reardon recommend Efudex for

5    two weeks?

6         A.    Yes.

7         Q.    Now, Dr. Reardon has subsequently testified that

8    he did not agree with a two-week period of treatment with

9    Efudex.  Was that brought to your attention?

10        A.    No.

11        Q.    He has testified that his protocol would be to

12   use Efudex for four weeks.  Were you aware of that?

13        A.    No.

14        Q.    It's your testimony that Dr. Reardon told you to

15   use the Efudex for two weeks; is that correct?

16        A.    To the best of my recollection, yes.

17        Q.    Tell me what you would have told Mr. Cherry

18   about Efudex.

19        A.    To use it on freshly cleaned skin.  Apply a

20   very, very thin layer twice a day, washing each time

21   before, and doing it twice a day for 14 days, and then

22   start using the desonide in the same manner until the

23   redness resolves.

24        Q.    Okay.  Anything else?

25        A.    We hand out an instruction sheet that

1    A.   I don't remember.

2    Q.   Do you have any information about that?

3    A.   I don't remember, not right now.

4    Q.   Is that something you would have discussed with

5  a patient?

6    A.   Not typically.

7    Q.   Now, I know you had recommended biopsy at this

8  point.  Were there any other alternatives to treatment

9  for Mr. Cherry at this point other than biopsy versus

10  Efudex?

11    A.   Well, there is cryotherapy; Aldara, which is

12  another chemotherapeutic drug.  I don't know that -- I

13  think those would be the only -- and surgery -- would be

14  the only other options.

15    Q.   So surgery would have been one option?

16    A.   Yes.

17    Q.   Now, I just want to put this conversation in

18  context.  Obviously, because at this point no biopsy had

19  been done, you did not really know for certain if there

20  was a potentially invasive carcinoma or not; is that

21  correct?

22    A.   Not for certain.

23    Q.   Okay.  But you were fairly confident that there

24  was no invasive component to this lesion because it was a

25  macule versus papule?

1      A.   Yes, and based on the recommendations
2  Dr. Reardon had made.
3      Q.   Now let's --
4                MR. CURTIN:  What time is it?
5                MR. SMART:  2:17.
6                MR. CURTIN:  Been going a little over an
7  hour.  Do you want a break?
8                THE WITNESS:  No, that's fine.
9                MR. CURTIN:  Then let's bash on.
10               Let's mark this as Exhibit Number 3,
11  please.
12               (Deposition Exhibit Number 3 was marked
13  for identification.)
14  BY MR. CURTIN:
15     Q.   And I'm showing you what has been marked as
16  Exhibit Number 3 to your deposition, which is a
17  dermatology note authored by you on January 15, 2010;
18  correct?
19     A.   Um-hum.
20     Q.   Yes?
21     A.   Yes.
22     Q.   Okay.  And this actually is both a clinical note
23  and a procedure note; is that right?
24     A.   It is.
25     Q.   It appears that Mr. Cherry had returned to you,

1    middle.  So, yeah, you can see the lateral.  I would

2    expect it to say that the lateral margins were included.

3        Q.   Okay.  So when you did the biopsy, you

4    deliberately left some behind?

5        A.   Absolutely.

6        Q.   So you were not doing the biopsy for purposes of

7    cure?

8        A.   Correct.

9        Q.   Can you tell on visual inspection whether the

10   lesion extends below the surface of the skin?

11       A.   No.

12       Q.   Did you examine the specimen yourself in the

13   lab?

14       A.   No.

15       Q.   Did you speak at any point with

16   Dr. Felty-Duckworth?

17       A.   Not that I recall.

18       Q.   Would you agree that based on what's in this

19   pathology report that invasive squamous cell carcinoma is

20   now on the differential diagnosis?

21       A.   Yes.

22       Q.   If invasive squamous cell carcinoma is on the

23   differential, would you agree with me that a reasonable

24   and prudent physician's assistant is obligated to try to

25   rule that out?

1      A.   I think I'm obligated to consider it, but then

2   you have to look at it in context, and I discussed this

3   with Dr. Reardon both before we did the biopsy -- because

4   we discussed doing the biopsy at the first visit, and it

5   didn't really change the treatment in his case because it

6   was still felt to be clinically an in situ lesion, and

7   pathologists often -- I don't think she wrote it here --

8   but will often say correlate clinically.

9           So pathology is not everything, but yes, it is a

10   consideration, but it has to be incorporated into

11   clinical experience, and Dr. Reardon's clinical

12   experience still said this was treatable with Efudex.

13      Q.   Need to parse that out a little bit.

14           What you're telling me, I think, is that

15   sometime after Dr. Felty-Duckworth signed off on this

16   pathology report, you and Dr. Reardon had a conversation

17   about it?

18      A.   I am nearly certain.  I cannot say with 100

19   percent certainty, but I'm pretty darn sure that's the

20   case.

21      Q.   Can you tell me anything about that

22   conversation?

23      A.   No.

24      Q.   Did you discuss whether it affected the

25   treatment plan?

**Steven Carbonniere, PA**          8/28/2015
**Cherry v. United States**

1      A.    I told you I don't remember the conversation.

2      Q.    So you had a conversation with -- you're fairly

3   certain you had a conversation with Dr. Reardon about the

4   pathology reports, but you can't tell me anything about

5   that conversation?

6      A.    I know that we discussed this case more than one

7   time.  I don't know exactly when.

8           But the critical junctures are when you first

9   suspect something like this and what will be done -- in

10   this case, the option of biopsy versus proceeding just to

11   treatment -- and then the next critical junction is once

12   you had a biopsy result with a definitive diagnosis, now

13   what.

14          And I cannot imagine I would have proceeded in

15   this case because of the potentially severe consequences

16   of not getting it right, then I would have just, oh, I'll

17   just proceed.

18      Q.    Okay.  And that's why you believe you consulted

19   Dr. Reardon?

20      A.    Yes.  I'm careful.

21      Q.    Okay.  I asked you a minute ago about what you

22   believe a reasonable and prudent physician's assistant

23   would be required to do.  I want to ask a slightly

24   different question now.

25          If invasive squamous cell carcinoma is on the

Steven Carbonniere, PA          8/28/2015
Cherry v. United States

```
 1          Given that the lesion has recurred despite
 2     treatment with Efudex, explain to me why that was the
 3     best option that you could offer Mr. Cherry.
 4                    MR. SMART:  Form.
 5                    You can answer.
 6                    THE WITNESS:  Because it's not -- I'm not
 7     the authority in an instance like this.  Despite
 8     questions that I might have sometimes, unless I'm certain
 9     based on previous experience with some other clinician or
10     literature that I've read, I will defer to what they
11     recommend, and as I said before, there is zero chance
12     that I would have proceeded with this treatment without
13     consulting one of the attendings.  It is not possible.
14     BY MR. CURTIN:
15          Q.    So absolutely you consulted Dr. Reardon or
16     another attending?
17          A.    Absolutely.
18          Q.    And Dr. Reardon or another attending told you
19     that the appropriate plan of treatment at this point was
20     Efudex for three weeks?
21          A.    Yes.
22          Q.    Okay.  And do you recall having this discussion,
23     or is it your assumption that you had this discussion?
24          A.    As I said before, it's not an assumption.  I
25     know I would have discussed this.
```

1    Q.   Do you recall having such a discussion?

2    A.   As I said before, I don't recall specifically

3    having this discussion.

4    Q.   Okay.  So can you tell us anything else about

5    the discussion you know you would have had?

6    A.   I would have given the history of this patient

7    having had a previous squamous cell carcinoma, that it

8    was treated with Efudex, clinically it had resolved, and

9    that he is presenting again with a similar lesion, and

10   that the patient did not want a biopsy.

11   Q.   I take it from your responses that the

12   recurrence is something of real concern to you?

13   A.   Yes.

14   Q.   Tell me why.

15   A.   Because either it represents incomplete

16   treatment of the initial lesion or this patient has

17   something driving his propensity for cancer, either a

18   human papilloma virus, some other irritant, or some

19   genetic propensity.

20   Q.   I wanted to ask you that, by the way.  You

21   looked at Mr. Cherry's penis through a scope on several

22   occasions; true?

23   A.   True.

24   Q.   Did you ever note lesions from HPV?

25   A.   Not that I recall.

1    partial penectomy eight months ago.

2        A.   About that time, yes.

3        Q.   Do you feel bad about that at all, what happened

4    to him?

5                    MR. SMART:  Objection, form.

6                    You can answer.

7                    THE WITNESS:  What do you mean by "feel

8    bad"?

9    BY MR. CURTIN:

10       Q.   I mean that only in the most general sense.  I'm

11   not asking you about culpability at this point.  But are

12   you sympathetic at all to his situation?

13       A.   Absolutely.

14       Q.   Have you looked back in your own mind at the

15   course of treatment that was provided here and asked

16   yourself is there anything I could have done to prevent

17   this?

18       A.   Yes.

19       Q.   Do you think that there was?

20       A.   Under the circumstances, no, because I have to

21   defer to what the attendings recommend.  They're the

22   experts.

23       Q.   Do you think you met the standard of care here?

24       A.   I think so, yes.

25       Q.   I've kind of tried to cover the waterfront as

1          BE IT KNOWN that the foregoing proceedings
were taken before me; that the witness before testifying
2    was duly sworn by me to testify to the whole truth; that
the questions propounded to the witness and the answers
3    of the witness thereto were taken down by me in shorthand
and thereafter reduced to typewriting under my direction;
4    that the foregoing is a true and correct transcript of
all proceedings had upon the taking of said deposition,
5    all done to the best of my skill and ability.
6          I CERTIFY that I am in no way related to any
of the parties hereto nor am I in any way interested in
7    the outcome hereof.
8        [x]  Review and signature was requested.
         [ ]  Review and signature was waived.
9        [ ]  Review and signature was not requested.
10          I CERTIFY that I have complied with the ethical
obligations in ACJA Sections (J)(1)(g)(1) and (2).
11
12
13
14
15    _____
Leslie J. Foldy
16    Arizona Certified Reporter 50041
17
            I CERTIFY that this Registered Reporting Firm
18    has complied with the ethical obligations in ACJA
Sections (J)(1)(g)(1) and (2).
19
20
21
22
23    _____
Foldy Reporting
24    Arizona Registered Reporting Firm R1004
25