**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lawrence N Cherry, et al., | No. CV-15-00236-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| United States of America, et al., | |
| Defendants. | |

Plaintiffs Lawrence N. Cherry and Judy N. Cherry, (collectively, "Plaintiffs"), brought this medical malpractice action against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"). Plaintiffs allege Mr. Cherry received negligent medical care for his penile cancer from employees of the United States at Carl T. Hayden Veterans Affairs Medical Center ("VAMC") in Phoenix, Arizona. From 2009 until 2013, Mr. Cherry received a series of treatments from medical practitioners at the VAMC, including dermatologist Dr. Christopher Reardon ("Dr. Reardon"), physician assistant Steven Carbonniere ("PA Carbonniere"), and urologist Dr. Paul Papoff ("Dr. Papoff"). Trial is set to begin in April 2019. Before the Court are the parties' motions in limine concerning expert testimony: five by the United States, (Docs. 218, 219, 220, 221, 229), and two by Plaintiffs (Docs. 230, 231).

## BACKGROUND

Mr. Cherry is a veteran of the Vietnam War. On February 19, 2009, Mr. Cherry saw Dr. Reardon of the VAMC's dermatology department for wart-like lesions on his legs,

feet, and penis. Dr. Reardon diagnosed Mr. Cherry with benign keratosis and a history of porphyria cutanea tarda (a genetic photosensitive skin condition). At this appointment, Dr. Reardon used liquid nitrogen to freeze off six of the keratoses on Mr. Cherry's body and the keratosis on his penis. On April 21, 2009, Mr. Cherry visited Dr. Reardon again and told him the bump on his penis had returned. Dr. Reardon again froze off the bump with liquid nitrogen and advised Mr. Cherry to return in one month. On August 31, 2009, Mr. Cherry was seen in the VAMC's dermatology department by Steven Carbonniere, a physician assistant ("PA"). PA Carbonniere examined several bumps on Mr. Cherry's head and legs and treated them with liquid nitrogen. On January 13, 2010, Mr. Cherry saw PA Carbonniere for a lesion on the tip of his penis. Mr. Cherry was diagnosed with presumed squamous cell carcinoma and was prescribed Efudex—a topical cream containing a chemotherapy agent. Two days later, Mr. Cherry returned to the VAMC's dermatology clinic to obtain a biopsy. Mr. Cherry was diagnosed with squamous cell carcinoma in situ of the glans penis.

A Licensed Practical Nurse directed Mr. Cherry to use Efudex as previously instructed by PA Carbonniere. In February 2011, Mr. Cherry reported a new lesion to PA Carbonniere, which PA Carbonniere reported as a "likely recurrence" of the squamous cell carcinoma on the tip of his penis. PA Carbonniere prescribed more Efudex treatment. Mr. Cherry reported yet another lesion on July 26, 2011, and was once again prescribed Efudex. In subsequent appointments in November 2011 and April 2012, Mr. Cherry reported he had not used the Efudex prescribed in July 2011. Mr. Cherry visited the VAMC's urology clinic on April 30, 2012. Dr. Papoff recommended re-biopsy, but by June 2012, Drs. Reardon and Papoff believed the lesion had cleared and the re-biopsy was not performed. Mr. Cherry visited the VAMC at least four more times during the remainder of 2012, reporting lesions on his penis.

In January 2013, Dr. Theodore Mobley, ("Dr. Mobley"), of the VAMC urology department performed a urethroscopy and urethral biopsy of the penile lesion. Dr. Mobley found tumor involvement in the urethra and removed the visible tumor mass on Mr.

Cherry's penis. Mr. Cherry was referred to the Mayo Clinic for further treatment. On March 21, 2013, Dr. Robert G. Ferrigni, ("Dr. Ferrigni"), performed a partial penectomy—amputation of a portion of the penis—and cystoscopy on Mr. Cherry.

Plaintiffs sued the United States in February 2015. While this litigation was ongoing, squamous cell carcinoma was discovered in Mr. Cherry's left lung. On May 22, 2018, Mr. Cherry underwent a left upper lob segmentectomy and mediastinal and hilar lymph node dissection.

Trial is set to begin on April 16, 2019. The parties have a number of disputes, including whether the VAMC practitioners performed below the standard of care during their treatment of Mr. Cherry's penile lesions, whether there was informed consent for the prescribed Efudex treatments, whether Dr. Reardon's supervision of PA Carbonniere was below the standard of care, and whether the practitioners' recommendations and treatments were the proximate cause of Mr. Cherry's harm. Before the Court are motions in limine to exclude certain expert testimony.

## LEGAL STANDARD

Fed. R. Evid. 702 governs expert testimony: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

Substantive Arizona law imposes additional requirements on expert testimony concerning the standard of care for medical professionals. *See, e.g.*, *Wright v. United States*, No. CV06-01788, 2008 WL 820557, at *4 (D. Ariz. Mar. 25, 2008). A.R.S. § 12-2604 provides: "If the party against whom or on whose behalf the testimony is offered is or claims to be a specialist, [the expert witness must] specializ[e] at the time of the occurrence that is the basis for the action in the same specialty or claimed specialty as

party against whom or on whose behalf the testimony is offered. If the party against whom or on whose behalf the testimony is offered is or claims to be a specialist who is board certified, the expert witness shall be a specialist who is board certified in that specialty or claimed specialty."

**ANALYSIS**

*1. The United States' Motion in Limine No. 1*

The United States moves to preclude Plaintiffs from arguing that Dr. Boaz Rabin's Compensation and Pension Examination Report, (the "Rabin C&P Report"), contains admissions of liability and causation by the United States. The United States also moves to exclude Dr. Boaz's testimony under A.R.S. § 12-2604 and Fed. R. Evid. 403. (Doc. 218.)

Prior to filing this lawsuit, Mr. Cherry submitted a disability claim under 38 U.S.C. § 1151, under which a veteran may receive compensation if his disability was caused by negligent or otherwise improper medical care provided by the Department of Veterans Affairs (the "VA"). 38 U.S.C. § 1151(a)(1) (a veteran may qualify for disability benefits if the proximate cause of the disability was "carelessness, negligence, lack of proper skill, error in judgment, or similar instances of fault on the part of the Department in furnishing the hospital care, medical or surgical treatment, or examination"). Mr. Cherry's disability claim sought compensation for the same injuries as the ones at issue in this litigation. The VA selected Dr. Rabin, an internal medicine doctor and a staff physician at the Southern Arizona Veterans Medical Center, to evaluate Mr. Cherry and prepare the C&P Report for his disability claim. Dr. Rabin conducted an in-person examination of Mr. Cherry and reviewed his medical records, and subsequently prepared the C&P Report, dated March 19, 2014. (Doc. 218-1.) The C&P Report concluded, among other things, that "[t]he disability (loss of penis shaft, i.e. loss of a creative organ) resulted from lack of skill by the VA dermatology provider," and "there was failure on the part of VA to timely diagnose and/or properly treat the claimed disease or disability, and allowed the disease or disability

to continue to progress." (Doc. 218-1 at 11.) After Mr. Cherry's § 1151 disability claim was granted, he sued the United States under the FTCA.

The parties dispute whether portions of the Rabin C&P Report are admissions of liability and causation by the United States. Plaintiffs argue that because Dr. Rabin was chosen by the VA—an agency of the United States—to prepare the C&P Report, and because his opinions were authorized and ratified by the VA, Dr. Rabin's opinions in the C&P Report are admissions against interest by the United States under Fed. R. Evid. 801(d)(2). The United States argues the opinions in the Rabin C&P Report are not admissions because the § 1151 process for disability claims is more lenient than litigation in federal court.

The United States is correct. Plaintiffs shall not argue at trial that the opinions in the Rabin C&P Report are admissions against interest by the United States. The § 1151 process is non-adversarial and employs a lower standard of proof. The Rabin C&P Report was prepared pursuant to this process for disability claims. As the Ninth Circuit has observed: "Disability hearings are *ex parte* and non-adversarial. Evidence presented in a § 1151 benefits hearing is limited to information presented by the claimant and certain types of information discovered by the VA. The VA is not authorized to develop evidence for the purpose of challenging the claimant, but rather is required to 'assist a claimant in developing the facts pertinent to [his or her] claim.'" *Littlejohn v. United States*, 321 F.3d 915, 920 (9th Cir. 2003) (holding that a § 1151 decision cannot be used as a sword, through issue and claim preclusion, to establish tort liability). Here, although Dr. Rabin was selected by the VA to evaluate Mr. Cherry, the VA was not allowed to develop evidence to challenge Mr. Cherry's § 1151 claim. Such a claimant-friendly process bears little resemblance to litigation in federal court, where the United States is expected to develop and offer evidence to defend Mr. Cherry's FTCA claim. As such, Dr. Rabin's opinions in the C&P Report—developed for Mr. Cherry's § 1151 disability claim—are not admissions by the United States.

The United States further argues the Rabin C&P Report should be excluded under Fed. R. Evid. 403 because it presents a danger of confusing the issues or wasting time. Because this is a bench trial rather than a jury trial, these potential dangers do not substantially outweigh the C&P Report's probative value. *See, e.g.*, *Cmty. Ass'n for Restoration of the Env't, Inc. v. Cow Palace, LLC*, 80 F. Supp. 3d 1180, 1216 (E.D. Wash. 2015) ("Rule 403 has a limited role, if any, in a bench trial."). Thus, the Court will not exclude the Rabin C&P Report under Fed. R. Evid. 403.

Finally, the United States argues Dr. Rabin is not permitted to offer standard of care opinions for dermatology or urology practitioners under A.R.S. § 12-2604. Under § 12-2604, a specialist cannot testify to the appropriate standard of care for medical providers in other specialties. *See Wright*, 2008 WL 820557, at *7. It follows that Dr. Rabin, an internal medicine specialist, cannot testify to the appropriate standard of care for dermatology or urology practitioners. Plaintiffs argue that Dr. Rabin should be allowed to offer opinions on the standard of care in other specialties because the VA chose him, rather than a dermatologist or urologist, as a medical examiner. This argument is incorrect. The VA chose Dr. Rabin to examine Mr. Cherry for his § 1151 disability claim. There is no indication that § 12-2604 applies in disability claims as it does in this litigation.

Accordingly, the United States' Motion, (Doc. 218), is granted in part and denied in part. Plaintiffs shall not argue the Rabin C&P Report contains admissions by the United States. Dr. Rabin shall not testify to the appropriate standard of care for specialists outside of internal medicine.

2. *The United States' Motion in Limine No. 2*

The United States' second motion in limine, (Doc. 219), also concerns the testimony of Dr. Rabin. The United States argues Dr. Rabin's expert opinion testimony should be excluded under Fed. R. Evid. 702 and *Daubert*. According to the United States, Dr. Rabin

lacks the necessary qualifications to testify as an expert in this matter. Further, the United States argues Dr. Rabin's opinions on breach are unreliable.

"The proponent of the expert bears the burden of demonstrating the expert is qualified." *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 833 (C.D. Cal. 2010). Here, Plaintiffs must establish by a preponderance of the evidence that Dr. Rabin is qualified to testify as an expert in this matter. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 593 n.10 (1993). Plaintiffs have not met their burden of showing that Dr. Rabin is "qualified as an expert by knowledge, skill, experience, training, or education[.]" Fed. R. Evid. 702. Plaintiffs primarily argue that Dr. Rabin is qualified because the VA chose him to prepare the C&P Report for Mr. Cherry's § 1151 disability claim and because Dr. Rabin's opinions constitute admissions by the United States. As discussed above, both of these arguments fail because the process for submitting a § 1151 disability claim is significantly different from litigation in federal court.

As the United States points out, Dr. Rabin is an internal medicine doctor with no training in dermatology or urology—the specialties at issue. Further, Dr. Rabin testified that he has no experience treating squamous cell carcinoma, did not consult experts in dermatology or urology, and could not remember if he consulted any literature to prepare the C&P Report. (Doc. 219 at 3–4.) Given Dr. Rabin's testimony, as well as Plaintiffs' failure to affirmatively demonstrate his qualifications, Dr. Rabin shall not be allowed to testify as an expert during trial. *See, e.g.*, *Diaz v. Johnson Matthey, Inc.*, 893 F. Supp. 358, 373 (D. N.J. 1995). Because Dr. Rabin shall not testify as an expert, the United States' challenge to his opinions on breach is moot.

The United States also argues Dr. Rabin should not be allowed to testify as a fact witness because his examination of Dr. Cherry occurred in March 2014, well after his operation. The Court disagrees. Dr. Cherry's post-operation examination of Mr. Cherry is relevant to certain issues, including injury and damages. Provided that Plaintiffs complied with the Federal Rules and any court orders in disclosing Dr. Rabin as a fact witness, they are allowed to call Dr. Rabin as a fact witness during trial.

Accordingly, the United States' Motion, (Doc. 219), is granted in part and denied in part.

*3. The United States' Motion in Limine No. 3*

The United States' third motion in limine concerning Dr. Rabin argues Dr. Rabin's testimony should be excluded under the mental processes privilege. The mental processes privilege protects government employees from answering "questions that either explicitly or implicitly sought information delving into the thoughts, analysis, and actions" of the employee that led to a finalized decision by the government agency. *Lugo v. Holder*, No. CV-13-02108, 2015 WL 1969091, at *2 (D. Ariz. 2015). Because Dr. Rabin shall not be offering expert opinion testimony pursuant to this Order, the Court sees no opportunity by which Dr. Rabin can be questioned on his mental processes in reaching the conclusions in his C&P Report. Accordingly, the United States' Motion, (Doc. 220), is denied as moot.

*4. The United States' Motion in Limine No. 4*

The United States moves to exclude Dr. Joseph K. Bush's Compensation and Pension Examination Report (the "Bush C&P Report"). (Doc. 221.) Dr. Bush prepared his C&P Report for another § 1151 disability claim submitted by Mr. Cherry, this one concerning his lung cancer. Mr. Cherry asserted that his lung cancer was the result of Agent Orange exposure during the Vietnam War. In the Bush C&P Report, Dr. Bush noted that Mr. Cherry's treating physicians had conflicting opinions on Mr. Cherry's lung cancer. On the one hand, Mr. Cherry's treating oncologist, Dr. Parminder Singh, believed his lung cancer was metastatic penile cancer. On the other hand, Drs. Beamer and Ryan, Mr. Cherry's treating thoracic surgeon and pathologist, believed his lung cancer was primary lung carcinoma. In his C&P Report, Dr. Bush deferred to Dr. Singh's opinion, writing: "It is acknowledged that there is a conflict between the final pathology report, the addendum of 5/30/2018, and the opinion of the veteran's oncologist. The latter is recognized as having special credibility in the matter of cancer diagnosis and treatment and as the veteran's treating specialist, who has the responsibility of making the therapeutic decisions

in this case. In deference to those facts, the diagnosis is accepted as . . . [s]quamous cell carcinoma of the penis, metastatic to lung[.]" (Doc. 221-1 at 6.)

The United States argues Dr. Bush's opinions are improper "vouching" for Dr. Singh's opinions. The United States also argues Dr. Bush is unqualified to offer expert opinions in this matter.

Plaintiffs shall not seek to offer the Bush C&P Report into evidence because Dr. Bush is not qualified to testify as an expert here. As discussed above, Plaintiffs have the burden of demonstrating that Dr. Bush is qualified. *See Gable*, 727 F. Supp. 2d 815, 833 (C.D. Cal. 2010). Plaintiffs have not met this burden. In their Response, Plaintiffs do not argue Dr. Bush is qualified because of his knowledge, skill, experience, training, or education. Rather, they argue Dr. Bush is qualified because "the Veterans Administration has already determined that Dr. Bush is qualified. It made that decision when it assigned him to do the compensation and pension exam." (Doc. 252 at 4.) This argument is incorrect because being qualified to conduct a compensation and pension exam for a § 1151 disability claim is not the same as being qualified to testify in federal court as an expert under Fed. R. Evid. 702 and *Daubert*.

Accordingly, the United States' Motion, (Doc. 221), is granted.

*5. The United States' Motion in Limine No. 5*

The United States moves to partially exclude the expert opinion testimony of Valerie Luethge-Stern ("PA Stern"). PA Stern is a physician assistant ("PA") who is expected to testify to, among other things, whether PA Carbonniere's treatment of Mr. Cherry violated the PA standard of care. The United States argues PA Stern's testimony on standard of care should not be admitted because she is unqualified and her opinions are not reliable.

First, the United States argues PA Stern is not qualified to testify to the standard of care for treatment of squamous cell carcinoma in situ of the penis because of her limited experience. The United States points out that PA Stern's experience is primarily in aesthetic procedures in dermatology and PA Stern has assisted in the treatment of

squamous cell carcinoma in situ of the penis on only one occasion. (Doc. 229 at 2.) The Court disagrees. PA Stern is qualified to offer expert testimony on the PA standard of care for treatment of squamous cell carcinoma in situ of the penis. Plaintiffs have shown that PA Stern has extensive training and experience: she completed the basic course of study for physician assistants, completed a masters-level program in dermatology, and has worked in the field of dermatology for more than 20 years. (Doc. 253 at 2.) That she has assisted in the treatment of squamous cell carcinoma in situ of the penis only once does not mean she lacks experience. As Plaintiffs point out, a diagnosis of squamous cell carcinoma in situ of the penis is exceedingly rare. PA Stern testified that throughout the course of her career, she has seen 20 lesions of the penis. Of those, only one turned out to be biopsy-proven squamous cell carcinoma. Besides, PA Carbonniere, the United States' expert and Mr. Cherry's treating physician assistant, testified that he had never seen squamous cell carcinoma in situ of the penis prior to treating Mr. Cherry.

Second, the United States requests the Court to exclude PA Stern's opinions on standard of care because they are unreliable. The United States takes issue with PA Stern's use of scientific literature in forming her opinions, arguing she did not consult more than a few sources, some of the literature reviews were published after the date of Mr. Cherry's treatment, and some of the articles undermine PA Stern's opinions. Here, the United States' concerns go to the weight, not admissibility, of PA Stern's opinions. The Ninth Circuit has instructed the *Daubert* criteria must be applied in a "flexible" manner to testimony by medical professionals. *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). Specifically, "much of medical decisionmaking relies on judgment—a process that is difficult to quantify or even to assess qualitatively," and medical testimony "may or may not be scientific evidence like the epidemiologic testimony at issue in *Daubert*." *Id.* (citation omitted). PA Stern's opinions on standard of care are based on her experiences as well as scientific literature. Having examined PA Stern's opinions and the articles she reviewed, the Court is not persuaded that PA Stern's opinions are unreliable.

Accordingly, the United States' Motion, (Doc. 229), is denied.

*6. Plaintiffs' Motion in Limine No. 1*

Plaintiffs move to exclude any testimony by defense witnesses regarding the standard of care applicable to PA Carbonniere, Mr. Cherry's treating physician assistant, other than the testimony of PA Carbonniere himself. (Doc. 230.) Plaintiffs assert that no other defense witness has the appropriate credentials to address the PA standard of care under A.R.S. § 12-2604. Specifically, a physician generally cannot testify against healthcare professionals with lesser credentials. *See St. George v. Plimpton*, 241 Ariz. 163, 167–68 (Ariz. Ct. App. 2016) ("[B]ecause Nurse Franklin is certified by the ASBN as a certified nurse midwife, any standard of care expert testifying against her must likewise be a certified nurse midwife."). The United States responds that a physician may testify to the PA standard of care because the supervising physician's standard of care applies to the PA's conduct. This is because the supervising physician delegates duties to the PA such that their obligations with regard to the delegated duties are concomitant and they are engaged in the "same health profession." (Doc. 236 at 4.) The United States also argues that because Dr. Reardon directed PA Carbonniere's treatment of Mr. Cherry, expert testimony regarding the physician assistant standard of care is irrelevant.

Plaintiffs are correct that a physician cannot testify to the PA standard of care under § 12-2604. *See M.M. v. Yuma Cty.*, No. 07-cv-01270, 2011 WL 5519905, at *2 (D. Ariz. Nov. 14, 2011). Although it is true that the supervising physician delegates certain tasks to the PA and is consequently responsible for the PA's conduct concerning those tasks, the United States cites no cases allowing a physician to testify to the PA standard of care under § 12-2604. Rather, the United States cites *Atencio v. Arpaio*, in which the court allowed a nurse practitioner to testify to the PA standard of care because the two professionals were engaged in the "same health profession." No. CV-12-02376, 2015 WL 11117187, at *4 (D. Ariz. Jan. 15, 2015). In *Atencio*, however, the court determined the nurse practitioner and PA had "similar skills and responsibilities," were both "physician extenders," and often had "substantially equal duties in their employment." *Id.* By contrast, the United States has not shown that physicians and PAs perform such similar jobs that they are engaged in

the "same health profession." As such, any physician expert witness shall not be allowed to testify to the PA standard of care.

The United States also argues the PA standard of care is irrelevant here because PA Carbonniere's conduct was directed by Dr. Reardon. Because there are factual disputes over Dr. Reardon's level of involvement in PA Carbonniere's treatment of Mr. Cherry, the Court makes no determinations on this issue at this stage. To the extent the PA standard of care is relevant, no defense witness aside from PA Carbonniere shall be allowed to testify to it.

Accordingly, Plaintiffs' Motion, (Doc. 230), is granted.

*7. Plaintiffs' Motion in Limine No. 2*

Plaintiffs move to preclude Dr. Donald F. Lynch and Dr. Robert G. Ferrigni from offering standard of care testimony concerning Dr. Reardon and PA Carbonniere. (Doc. 231.)

The United States notes Plaintiffs' counsel did not confer or attempt to confer with defense counsel prior to filing this Motion, in violation of LRCiv 7.2(a). The United States is correct. Perhaps if Plaintiffs' counsel had conferred with defense counsel, they would have discovered the parties do not have real disagreements regarding the testimony of Drs. Lynch and Ferrigni.

Plaintiffs argue A.R.S. § 12-2604 prohibits Drs. Lynch and Ferrigni from testifying to the standard of care applicable to Dr. Reardon and PA Carbonniere. In its Response, the United States asserts: "Defendant does not intend to elicit testimony from Drs. Lynch or Ferrigni regarding the standard of care applicable to either Dr. Reardon or PA Carbonniere, or to seek their opinion regarding whether Dr. Reardon or PA Carbonniere met the applicable standard of care." (Doc. 235 at 2.)

Because the Court has identified no disputes between the parties, Plaintiffs' Motion, (Doc. 231), is denied as moot.

Accordingly,

**IT IS ORDERED** the United States' Motion, (Doc. 218), is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** the United States' Motion, (Doc. 219), is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** the United States' Motion, (Doc. 220), is **DENIED** as moot.

**IT IS FURTHER ORDERED** the United States' Motion, (Doc. 221), is **GRANTED**.

**IT IS FURTHER ORDERED** the United States' Motion, (Doc. 229), is **DENIED**.

**IT IS FURTHER ORDERED** Plaintiffs' Motion, (Doc. 230), is **GRANTED**.

**IT IS FURTHER ORDERED** Plaintiffs' Motion, (Doc. 231), is **DENIED** as moot.

Dated this 4th day of April, 2019.

Honorable Roslyn O. Silver
Senior United States District Judge