**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lawrence N Cherry, et al., | No. CV-15-00236-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| United States of America, et al., | |
| Defendants. | |

Plaintiffs Lawrence Cherry ("Mr. Cherry") and Judy Cherry ("Mrs. Cherry") filed suit under the Federal Tort Claims Act (the "FTCA"). Mr. Cherry is a veteran who received medical care at the Carl T. Hayden VA Medical Center (the "VAMC"), a facility operated by Defendant United States of America. Plaintiffs allege that medical practitioners at the VAMC breached the standard of care in treating Mr. Cherry's penile squamous cell carcinoma, causing his partial penectomy in 2013. Plaintiffs also allege that as a result of the practitioners' breach, his squamous cell carcinoma metastasized to his lung and caused a lung lesion to grow. After a six-day bench trial, and consideration of the testimony of the witnesses, the exhibits admitted into evidence, and the memoranda submitted by the parties, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. Plaintiffs will be awarded judgment with respect to Mr. Cherry's partial penectomy but not with respect to his lung cancer. Judgment in favor of Plaintiffs shall be awarded in the amount of $3,750,000.00.

# I. FINDINGS OF FACT

## A. Background

Plaintiff Lawrence Cherry is a 70-year-old veteran of the Vietnam War. (Doc. 217 at 3.) Mr. Cherry served in combat from 1966 until 1968, volunteering for a second tour in Vietnam. (Doc. 290 at 227–28.) He has received numerous medals and honors for his military service. (Doc. 290 at 230.) Mr. Cherry is entitled to medical treatment through the United States Department of Veterans Affairs and has been treated for various service-related conditions, including post-traumatic stress disorder ("PTSD"), hearing loss, tinnitus, coronary artery disease, and a blood disorder caused by exposure to Agent Orange. (Doc. 290 at 231). Mr. Cherry has been married to Plaintiff Judy Cherry for 44 years. (Doc. 217 at 3.)

## B. 2009 VAMC Treatment

On February 19, 2009, Mr. Cherry saw Dr. Christopher Reardon, a dermatologist at the VAMC in Phoenix, Arizona, and reported he had wart-like, white lesions on his legs and feet, as well as a similar crusty bump on his penis that he had picked off. (Doc. 217 at 3.) Dr. Reardon diagnosed Mr. Cherry with benign keratosis and used liquid nitrogen to freeze off the keratoses, including one on his penis. (Doc. 217 at 3.) On April 21, 2009, Mr. Cherry returned to see Dr. Reardon, reporting that the bump on the head of his penis had returned, and Dr. Reardon used liquid nitrogen to treat the bump. (Doc. 217 at 3.)

## C. 2010 VAMC Treatment

On January 13, 2010, Mr. Cherry again visited the dermatology department ("Dermatology") at the VAMC, reporting a lesion at the tip of his penis. (Doc. 217 at 3.) Physician Assistant Steven Carbonniere ("PA Carbonniere") examined Mr. Cherry and authored a clinical note, which stated the presence of a "6mm x 4mm erythematous[1] papule on tip of penis circumscribing anterior aspect of urethral meatus but no erythema in meatus.[2]" (Ex. 5.) Dr. Reardon, who was PA Carbonniere's supervising physician,

---

[1] "Erythematous" is the medical term for red. (Doc. 289 at 126.)
[2] The "meatus" is defined as "the external portion of the urethral opening" of the penis.

was present for a portion of the appointment but testified that he disagreed with PA Carbonniere's written description of Mr. Cherry's lesion. (Doc. 289 at 76.) Dr. Reardon testified that he recalled the lesion was a macule, which is flat, rather than a papule, which is raised.[3] (Doc. 289 at 76.)

Mr. Cherry was diagnosed with presumed squamous cell carcinoma ("SCC") on the tip of his penis and was prescribed Efudex, a topical cream containing a chemotherapy agent, to use for two weeks. (Doc. 217 at 4.) Squamous cell carcinoma is a type of skin cancer. (Doc. 291 at 49.) SCC in situ is defined as "superficial" and is not invasive. (Doc. 291 at 74.) Left untreated, SCC in situ can evolve into invasive SCC. (Doc. 291 at 45.) Dr. Reardon testified that Mr. Cherry's lesion "did not look like an invasive carcinoma" because it was a macule rather than a papule. (Doc. 289 at 93–94.) Dr. Reardon believed that Mr. Cherry was suffering from an underlying Human Papilloma Virus ("HPV") infection, which can give rise to both SCC in situ and invasive SCC. (Doc. 289 at 103–04.)

Mr. Cherry initially declined a biopsy at the January 13 appointment but returned for a shave biopsy[4] just two days later on January 15. (Doc. 217 at 3–4.) Dr. Anna Felty-Duckworth, a pathologist at the VAMC, authored the pathology report for Mr. Cherry's biopsy. (Ex. 11.) According to the report, the diagnosis was "squamous cell carcinoma in-situ (Bowen's disease) involving the deep and lateral margins." (Ex. 11.) It also noted: "Due to the superficial nature of the biopsy, an underlying invasive component cannot be ruled out." (Ex. 11.) A nurse called Mr. Cherry to inform him of the results of his biopsy. (Doc. 293 at 12–13.) Mr. Cherry testified that nobody from the VAMC told him the margins of the biopsy were positive or that invasive SCC had not been ruled out. (Doc. 293 at 12–13.) A written record of the phone call stated Mr. Cherry was instructed to continue using Efudex in accordance with the original treatment plan. (Ex. 12.) Mr.

---

(Doc. 217 at 3.)
[3] Dr. Reardon first expressed disagreement with PA Carbonniere's written description in 2014, three years after the January 2010 appointment. (Doc. 289 at 81.)
[4] A shave biopsy is by definition "superficial" and does not reach the deep margins. (Doc. 301 at 72).

Cherry was neither offered nor informed of any other treatment options, including a surgical option called Mohs surgery. (Doc. 293 at 13.)

On March 5, 2010, Mr. Cherry returned to the VAMC's dermatology clinic. The clinical note from this appointment, authored by PA Carbonniere, observed the Efudex treatment had "excellent results." (Ex. 13.) The note indicated Mr. Cherry had "[m]ild hyperpigmentation on glans penis around dorsal urethral meatus" but "[n]o invasion seen into meatus." (Ex. 13.)

**D. 2011 VAMC Treatment**

On February 9, 2011, Mr. Cherry returned to the dermatology department at the VAMC. (Ex. 14.) The clinical note, authored by PA Carbonniere, described another lesion on Mr. Cherry's penis: "6mm x 3mm erythematous pink scaly papule on tip of penis circumscribing anterior aspect of urethral meatus but no erythema in meatus." (Ex. 14.) The note stated this lesion was a "[l]ikely reoccurrence of SCC on tip of penis." (Ex. 14.) At this appointment, Mr. Cherry was prescribed Efudex to use for three weeks. (Ex. 14.) At trial, Dr. Reardon testified that he disagreed with PA Carbonniere's clinical note, saying that although nothing in the written record indicates he was present at the appointment, he recalled examining Mr. Cherry. (Doc. 289 at 120.) According to Dr. Reardon, Mr. Cherry's lesion was a flat macule rather than a raised papule, and the clinical note was again incorrect in its description. (Doc. 289 at 121.) In addition, Dr. Reardon testified Mr. Cherry's lesion was "linear," rather than circumscribing the meatus as the note observed. (Doc. 289 at 121.) Mr. Cherry, on the other hand, testified the lesion was raised and "adjacent to the urethral opening." (Doc. 293 at 15.) Dr. Reardon also disagreed with the note's characterization of the lesion as a "reoccurrence," testifying that it "looked independent" from the previous lesion because he recalled it was in a different location. (Doc. 289 at 122–23.) The Court concludes that Dr. Reardon's testimony regarding the February 2011 appointment was not credible. Dr. Reardon's testimony at trial was inconsistent with his deposition testimony, in which he stated he did not recall being present at the February 2011 appointment. (Doc 289 at 118–19.)

Moreover, Dr. Reardon's description of Mr. Cherry's lesion differed from the written record in almost every material aspect, and the Court finds it incredible that Dr. Reardon had a detailed memory—at the time of trial, eight years later—of the particulars of Mr. Cherry's lesion, down to its exact location relative to a previous lesion.

Mr. Cherry again visited the VAMC on July 26, 2011. The clinical note for this visit was authored by Dr. Reardon. (Ex. 15.) The note stated Mr. Cherry was "here today for . . . recurrence of SCC on penis," and described the penile lesion as a "linear 3mm x 7mm erythematous macule at tip of glans penis." (Ex. 15.) The note indicated Mr. Cherry had a history of "SCC of tip of penis" and that it was "treated for 2 weeks the first time," but made no mention of Mr. Cherry's February 2011 appointment and subsequent three-week treatment with Efudex. (Ex. 15.) Dr. Reardon testified that at this point, he became concerned because Mr. Cherry had experienced three occurrences of SCC in situ at or near the tip of his penis, something he had never seen in his career. (Doc. 289 at 132–33.) But Dr. Reardon determined, without a reliable medical explanation, that a second biopsy was not needed because his "clinical judgment told [him] this is still squamous cell carcinoma in situ." (Doc. 289 at 136.) While Dr. Reardon testified during his deposition that he believed Mr. Cherry had "either a spread [of the previous lesions] or a new one," he testified at trial that the lesion he observed in July 2011 was a "new lesion" that was unrelated to the previous lesions. (Doc. 289 at 133–34.) Dr. Reardon testified that he then prescribed a four-week treatment of Efudex in July 2011 because he believed that the previous Efudex treatments were effective and had completely resolved Mr. Cherry's other lesions. (Doc. 289 at 136.) The clinical note stated: "[P]atient to return to clinic in 1–2 months to follow progress of Efudex" and "[m]ay consider urology eval after [treatment]." (Ex. 15.) According to Dr. Reardon, he considered referring Mr. Cherry to a urologist because he was concerned that even though there was no visible involvement of the "external most portion of the meatus," he could not rule out that "there might be something beyond" what he could see. (Doc. 289 at 139.) Nonetheless, he did not refer Mr. Cherry to a urologist at this appointment.

### E.  2012 VAMC Treatment

Mr. Cherry next saw Dr. Reardon on April 12, 2012, and Dr. Reardon's clinical note described a "[l]inear 2.5cm x 1.5cm erythematous macule with scaling at tip of glans penis, now adjacent to meatus." (Ex. 17.)  According to the note, "[patient] states that the lesion on his penis has not gotten any bigger, does not bleed or cause pain, [does not have] any urinary [symptoms]." (Ex. 17.)  The note also indicated that Mr. Cherry "has not been compliant with [follow up] appointments and admits that he did not follow through with the 4 weeks Efudex treatment to the SCC on penis." (Ex. 17.)  At this appointment, Dr. Reardon referred Mr. Cherry to the urology department ("Urology") at the VAMC.  (Ex. 17.)  Dr. Reardon's consult request provided information about Mr. Cherry's history of penile lesions and treatment with Efudex.  (Ex. 18.)  It also stated: "SCC site is now slightly raised and is adjacent to the meatus.  Please evaluate the lesion, particularly if there is any mucosal[5] involvement, and whether there is any other treatment you would recommend[.]" (Ex. 18.)

On April 30, 2012, Mr. Cherry had an appointment at the VAMC's urology department and saw Physician Assistant Robert Torigian ("PA Torigian") and Dr. Paul Papoff, a urologist. (Ex. 19.)  Dr. Papoff reviewed Mr. Cherry's medical records and Dr. Reardon's consult request, and understood "from Dr. Reardon's referral that he was concerned about the patient, that there was some other insidious process going on." (Doc. 292 at 19.)  Dr. Papoff testified that he conducted a physical examination of Mr. Cherry's penis, which included looking at the genitalia, palpating the genitalia for induration or hardness, and everting and tubularizing the edges of the meatus to "look further into the urethral meatus into the mucosa." (Doc. 292 at 14–16.)  According to Dr. Papoff, this physical examination did not reveal abnormal findings in the mucosa.  (Doc. 292 at 16.)  Mr. Cherry, on the other hand, testified that Dr. Papoff never physically examined his penis.  (Doc. 293 at 21–22.)

---

[5] The "mucosa" is defined as a "type of tissue that lines the interior of both the meatus and the deeper urethra." (Doc. 289 at 149.)

The clinical note from this appointment contained an initial observation written by PA Torigian and signed off by Dr. Papoff, and an addendum written by Dr. Papoff a day after the appointment. (Ex. 19.) PA Torigian's clinical note described two areas of involvement: a "[p]unctate lesion at the top of the meatus" with "erythema to left lateral aspect of the meatus." (Ex. 19.) Although Dr. Papoff reviewed and signed off on PA Torigian's note at the time, and Dr. Papoff's addendum did not describe any type of physical examination or physical findings of Mr. Cherry's penis, Dr. Papoff testified at trial, seven years after the appointment, that he disagreed with PA Torigian's characterization of Mr. Cherry's lesion as "at the top of the meatus." (Doc. 292 at 34; Ex. 19.) According to Dr. Papoff, he recalled "there was a punctate lesion which was lateral to the meatus, on the left lateral side, not involving the meatus." (Doc. 292 at 34.) And while PA Torigian's note indicated two areas of involvement, Dr. Papoff testified there was only one. (Doc. 292 at 37.) Dr. Papoff's addendum noted Mr. Cherry had "no new voiding [complaints]" but "had a splayed stream[6] [while urinating for] 5 yr." (Ex. 19.) Mr. Cherry testified he did not tell Dr. Papoff that he had experienced a splayed stream for five years. (Doc. 293 at 21.) Rather, Mr. Cherry testified that as of April 2012, he had experienced a splayed stream for approximately five months and that he told Dr. Papoff it was five months. (Doc. 293 at 21.)

Dr. Papoff testified that he determined Mr. Cherry's condition was "not concerning" based on the physical examination. (Doc. 292 at 18.) Moreover, Dr. Papoff testified that a splayed stream for five years was not cause for concern because "five years implies chronicity, meaning it's been there for a long time, it's not troubling, it's not causing the patient any ill effect." (Doc. 292 at 62.) Allegedly because Dr. Papoff believed Mr. Cherry's condition was not concerning, he did not perform a cystoscopy,[7] a

---

[6] A "splayed stream," as described by Mr. Cherry, means that when he goes "to the bathroom [urine] goes in every direction but straight." (Doc. 293 at 21.)

[7] According to Dr. Dudley Danoff, Plaintiffs' expert urologist, a cystoscopy involves inserting "the cystoscope through the penis, through the pendulous urethra, through the prostate area, through the bladder neck and up into the bladder." (Doc. 291 at 78.) In this particular case, "all that was really needed was a urethroscopy," which involves inserting the cystoscope only within the urethra. (Doc. 291 at 78.) The parties appear to use "cystoscopy" and "urethroscopy" interchangeably, with the understanding that they

very basic urological procedure in which a scope is passed through the urethra for inspection. (Doc. 292 at 20.) According to Dr. Papoff, a cystoscopy was not clinically indicated because he allegedly "saw no evidence of any meatal involvement of the lesion, and the patient had no history that indicated any voiding problems were new or changed or different or were bothersome to him." (Doc. 292 at 22.) Inexplicably, Dr. Papoff did order a CT scan of the abdomen and pelvis to evaluate Mr. Cherry for potential lymph node involvement and metastatic disease. (Doc. 292 at 54.) Dr. Papoff testified, but did not credibly explain why, a CT scan to look for metastasis was clinically indicated even though a cystoscopy to assess urethral involvement was not. (Doc. 292 at 54.)

On June 21, 2012, Mr. Cherry had an appointment with Dr. Reardon in Dermatology to follow up about the lesion on his penis. Dr. Reardon's note stated that "[patient] went to Urology after starting the Efudex treatment but they just ordered an abdominal CT and did not look at the meatus of the penis as requested." (Ex. 21.) Dr. Reardon also recorded: "[Patient] to [follow up] with Urology today and asked him to specifically ask them [to] check the mucosal meatus of the penis to ensure that it is clear." (Ex. 21.) Dr. Reardon testified that Mr. Cherry told him the urology department had not looked at his meatus or urethra, and that Dr. Reardon sent Mr. Cherry back "to tell the urologist that he needed to inspect the mucosal meatus." (Doc. 289 at 160–61.) Mr. Cherry then saw Dr. Papoff on the same day. (Ex. 22.) Dr. Papoff reviewed the results of the CT scan with Mr. Cherry, which showed no evidence of metastatic disease. (Ex. 22.) In his note, Dr. Papoff wrote that Mr. Cherry reported "the lesion has fully resolved," and recorded that "penis / meatus normal." (Ex. 22.) According to Dr. Papoff, he made this finding after performing a physical examination. (Doc. 292 at 23.) But, as noted above, Mr. Cherry testified that Dr. Papoff never examined his penis. (Doc. 293 at 21–22.)

In August 2012, Mr. Cherry underwent heart surgery for an unrelated condition. As a consequence of this surgery, Mr. Cherry was prescribed the blood thinner Plavix.

refer to a procedure in which a scope is inserted to examine the urethra.

(Doc. 293 at 24.)   After his recovery from heart surgery, Mr. Cherry rather desperately attempted to make another appointment with Urology.   (Doc. 293 at 24.)   According to Mr. Cherry, when he spread apart the opening of his penis, he "could see something white in the inside."   (Doc. 293 at 24–25.)   Mr. Cherry also experienced pain and sensitivity of his penis.   (Doc. 293 at 27.)   Mr. Cherry made multiple calls to Urology but never received an answer.   (Doc. 293 at 25.)   Consequently, as supported by the VAMC's records, Mr. Cherry contacted a patient advocate on October 29, 2012, and said: "I have been trying to contact the Urology clinic with no luck.   No one answer[s] the phone and there is no voicemail."   (Ex. 24.)   Mr. Cherry requested that someone call him back to "schedule an [appointment] as soon as possible."   (Ex. 24.)   Dr. Papoff then called Mr. Cherry on October 30, 2012, and his note of the call stated: "[Patient] called [regarding] pain at glans penis.   It is sensitive to touch.   He has no visible lesion on penis and denies discharge or dysuria.   [Patient was] advised that urology cannot help him with this and that it might represent a neuropathic pain.   Advised to contact dermatology[.]"   (Ex. 25.)   Mr. Cherry testified that Dr. Papoff emphatically told him: "What part of this don't you understand?   There's nothing I can do to help you.   This case is closed.   Go see Dr. Reardon."   (Doc. 293 at 25.)

   Mr. Cherry returned to Dr. Reardon.   Dr. Reardon's note, dated November 29, 2012, stated: "For SCC [patient] went to Urology but felt he was not properly examined. No current external lesions on penis.   Now for the past 3 months is having hypersensitivity at the tip of the penis and noted a white lesion at the meatus.   Has split stream when urinating."   (Ex. 29.)   Dr. Reardon referred Mr. Cherry back to Urology, noting: "[Patient] to reschedule with urology as problem associated with penis is internal and [patient] describes urethral obstruction.   Also want them to confirm absence of SCC in urethral meatus."   (Ex. 29.)   Dr. Reardon helped Mr. Cherry obtain an appointment with a VAMC urologist other than Dr. Papoff.   (Doc. 293 at 28–29.)

   Dr. Papoff's testimony was unworthy of belief with regard to the April 2012 and June 2012 appointments.   His testimony about Mr. Cherry's lesion was inconsistent with

much of the written record. For example, Dr. Papoff testified that the punctate lesion observed in April 2012 was "lateral to the meatus" rather than "at the top of the meatus," as specifically recorded in PA Torigian's note. (Doc. 292 at 34.) Dr. Papoff's written addendum did not contain any of his own physical observations of Mr. Cherry's lesion. (Ex. 19.) And although Dr. Papoff reviewed and signed off on PA Torigian's note, he did not correct the findings that he allegedly believed to be inaccurate or unclear. (Doc. 292 at 36.) Dr. Papoff's testimony that he carefully examined Mr. Cherry's penis was contradicted by Mr. Cherry's credible testimony and contemporaneous written documents reflecting Mr. Cherry's multiple complaints about Dr. Papoff's failure to examine his penis. Further, Dr. Papoff's testimony about the CT scan was plainly nonsensical. Dr. Papoff testified a cystoscopy—which tests for urethral involvement—was not clinically indicated, but a CT scan—which tests for lymph node involvement and metastasis—was clinically indicated. But any urethral involvement, including invasive carcinoma, would likely have occurred before the disease could have metastasized to the lymph nodes and other areas. As Dr. Dudley Danoff, Plaintiffs' expert urologist, explained, a CT scan was "totally irrelevant" under those circumstances. (Doc. 291 at 111.) According to Dr. Danoff: "The patient is sent to a urologist with a penile lesion. A urologist should be concerned about any involvement of the urethra. A CT scan does not answer that question." (Doc. 291 at 111.) Dr. Papoff never provided a reasonable explanation for this inconsistency. Finally, Mr. Cherry's VAMC records did not show any complaints about a splayed stream until April 2012. (Doc. 292 at 38.) Had Mr. Cherry experienced a splayed stream for five years, it is implausible that he would have failed to raise the issue during one of his many earlier appointments regarding the lesions on his penis.[8]

As such, the Court finds that at the April 2012 and June 2012 urology appointments, Dr. Papoff did not physically examine Mr. Cherry's penis, and did not

---

[8] Even Defendant's own expert, Dr. Donald Lynch, believed Mr. Cherry had reported five months rather than five years: "When I first saw the chart, it said that the splayed stream had been present for five years. Later we determined that that was a typographical error and that, in fact, the complaint was five months, which is shorter, more acute period of time." (Doc. 302 at 53.)

evert and tubularize the meatus or palpate the penis; at the April 2012 appointment, Mr. Cherry had a punctate lesion at the top of his meatus, as well as erythema to the left lateral side of the meatus; and at the April 2012 appointment, Mr. Cherry did report to Dr. Papoff that he had experienced a splayed stream for five months, not five years.

### F. Further Treatment and Penectomy

On December 24, 2012, Mr. Cherry saw Dr. Theodore Mobley, another urologist at the VAMC. Mr. Cherry complained about "increasing problems with spraying of his urinary stream" that had been occurring in the last two to three months. (Ex. 33.) Dr. Mobley observed a "necrotic lesion inside the meatus that appears mostly on the left side," as well as "induration on both side[s] of the end of the glans penis." (Ex. 33.) Dr. Mobley noted Mr. Cherry's condition was "[p]ossible recurrent penile carcinoma, involving the end of the urethra and the glans penis." (Ex. 33.)

In January 2013, Dr. Mobley performed the first cystoscopy, as well as a biopsy of Mr. Cherry's lesion. (Ex. 43.) Dr. Mobley found tumor involvement in the urethra and removed the visible tumor mass at the end of Mr. Cherry's penis. (Doc. 217 at 7.) The pathology report from the biopsy revealed a well-differentiated squamous cell carcinoma. (Doc. 217 at 7.) Dr. Mobley referred Mr. Cherry to the Mayo Clinic in Scottsdale, Arizona, for further treatment. (Doc. 217 at 7.)

Dr. Robert Ferrigni at the Mayo Clinic saw Mr. Cherry on January 23, 2013. Observing that the January 2013 biopsy had a "positive surgical margin, meaning that the cancer was coming to the extreme of where [they] had taken out tissue," and he could not determine how much residual cancer there was, Dr. Ferrigni anticipated having to perform surgery on Mr. Cherry. (Doc. 291 at 19.) Dr. Ferrigni wrote: "[W]e will plan a procedure where we perform a cystoscopy under anesthesia and then a resection of a portion of the glans penis trying to get clean margins. Patient understands he may need a distal penectomy in this circumstance. It is unclear yet how much penis will be removed in this process." (Ex. 50.) Because Mr. Cherry was still on the blood thinner Plavix from his heart surgery, Dr. Ferrigni could not perform the surgery until two months later.

Mr. Cherry's surgery took place on March 21, 2013. (Doc. 217 at 7.) Dr. Ferrigni testified he performed a partial penectomy on Mr. Cherry by surgically removing the glans penis. (Doc. 291 at 27.) The surgery addressed two areas of disease involvement: an invasive "body of tumor that formed . . . right around the meatus," and an additional "carcinoma in situ process going up the [urethral] channel" with "some early invasion." (Doc. 291 at 40.) Dr. Ferrigni performed the penectomy so that he could get clean margins, including with respect to the carcinoma tracking up the urethra. (Doc. 291 at 23.) Overall, the portion of the penis that Dr. Ferrigni removed was 4.2 centimeters in length. (Doc. 291 at 27.)

The penectomy, which removed the glans penis in its entirety, had a grievous physical and emotional impact on Mr. and Mrs. Cherry's lives. Mr. Cherry testified that although he is physiologically capable of getting an erection, the residual penis is not sexually functional and he no longer has a sexual relationship with his wife. (Doc. 293 at 38.) Mr. Cherry suffers from various urinary problems, including the inability to stand up while urinating and difficulty controlling his urine, that have caused him to urinate on himself on multiple occasions. (Doc. 293 at 40.) Further, Mr. Cherry testified he is voiding twice as often as before and it is difficult to accomplish. (Doc. 293 at 37.) To keep his urethra open, Mr. Cherry, with the assistance of his wife, uses a specially-designed "whalebone." (Doc. 301 at 88–89.) Finally, the penectomy exacerbated Mr. Cherry's clinical depression, anxiety, and PTSD, and adversely affected the pleasures he derived from some activities of normal life. (Doc. 293 at 41.)

**G. Mr. Cherry's Lung Cancer**

On April 2, 2018, while this lawsuit was pending, a CT scan identified a suspicious lesion in the upper lobe of Mr. Cherry's left lung. (Doc. 217 at 7.) Dr. Parminder Singh, Mr. Cherry's oncologist at the Mayo Clinic, ordered a biopsy that confirmed the lung lesion to be squamous cell carcinoma. (Doc. 290 at 20.) In May 2018, Dr. Staci Beamer, a thoracic surgeon at the Mayo Clinic, surgically removed Mr. Cherry's lung tumor. (Doc. 217 at 8.) Dr. Margaret Ryan, a pathologist at the Mayo

Clinic, then performed a pathological analysis of the removed lung tumor. (Doc. 290 at 205–06.)

Practitioners at the Mayo Clinic disagreed on whether Mr. Cherry's lung tumor was metastatic penile cancer or primary lung cancer. Dr. Ryan concluded Mr. Cherry's tumor was metastatic from the penile carcinoma, because specimens from both lesions appeared to be indistinguishable and both tested positive for the p16 protein, a proxy for HPV. (Doc. 290 at 206–11.) Dr. Singh currently treats Mr. Cherry for metastatic penile cancer. (Doc. 290 at 20.) On the other hand, when Dr. Beamer presented Mr. Cherry's case to a tumor board—a group of physicians of different specialties who discuss cases and share opinions—the board felt that Mr. Cherry's lung tumor "looked more likely to be a lung primary than to be a metastatic lesion." (Doc. 302 at 15–16.) Dr. Beamer testified that her own opinion was "right in the center" and she could not say whether Mr. Cherry's lung tumor was a primary lung cancer or metastatic penile cancer. (Doc. 302 at 29.)

## II.    CONCLUSIONS OF LAW

Plaintiffs brought suit under the FTCA, which holds the United States liable "for money damages . . . injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of an employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The parties agree that Arizona substantive law applies. (Doc. 217 at 8.) Under Arizona law, a "medical malpractice action" is defined as an "action for injury or death against a licensed health care provider based upon such provider's alleged negligence, misconduct, errors or omissions, or breach of contract in the rendering of health care, medical services, nursing services or other health-related services or for the rendering of such health care, medical services, nursing services or other health-related services, without express or implied consent[.]" A.R.S. § 12-561. To prevail in a malpractice action, the plaintiff must prove

the existence of a duty, a breach of that duty, causation, and damages. *See Massara v. United States*, No. CV-13-00269-TUC-BPV, 2014 WL 12527303, at *2 (D. Ariz. Sept. 23, 2014) (citing *Seisinger v. Siebel*, 203 P.3d 483, 492 (Ariz. 2009)).

Plaintiffs allege four theories of liability: (1) Dr. Reardon and PA Carbonniere failed to provide Mr. Cherry with more effective treatment options, including Mohs surgery, and the critical information necessary to choose an appropriate treatment option; (2) Dr. Reardon and PA Carbonniere prescribed Efudex, a "suboptimal" form of treatment; (3) Dr. Reardon and PA Carbonniere failed to refer Mr. Cherry to a urologist prior to April 2012 for a timely evaluation of his urethra; (4) Dr. Papoff failed to perform a cystoscopy on Mr. Cherry at the April 2012 and June 2012 urology appointments. (Doc. 311 at 1–2.) The Court strongly leans toward finding that Dr. Reardon and PA Carbonniere should have informed Mr. Cherry of Mohs surgery as a treatment option, and should have referred Mr. Cherry to Urology well before April 2012. However, because the Court finds conclusively in favor of Plaintiffs and against Defendant with respect to the fourth theory, it is unnecessary to consider the other theories.

**A. Duty and Breach**

Dr. Papoff acted below the standard of care when he failed to perform a cystoscopy at the April 2012 and June 2012 appointments. Under Arizona law, a "breach of duty in malpractice actions require[s] proof that the defendant failed to exercise the 'same care in the performing of his duties as was ordinarily possessed and exercised by other physicians of the same class in the community in which he practiced.'" *Seisinger v. Siebel*, 220 Ariz. 85, 94 (Ariz. 2009). The "'yardstick' by which a physician's or other healthcare provider's compliance with his duty is measured is commonly referred to as the 'standard of care,'" which is generally established by expert testimony. *Mann v. United States*, No. CV-11-8018-PCT-LOA, 2012 WL 273690, at *6 – 7 (D. Ariz. Jan. 31, 2012) (citations omitted).

Here, a reasonable and prudent urologist would have performed a cystoscopy in light of Mr. Cherry's recurring penile lesions, recent change in urinary symptoms, and a

referring physician's concern that something serious was potentially occurring. Dr. Papoff testified that he understood Dr. Reardon was concerned about an "insidious process going on."[9] (Doc. 292 at 19.) Dr. Reardon's consult request clearly asked Dr. Papoff to "[p]lease evaluate the lesion, particularly if there is any mucosal involvement." (Ex. 18.) Dr. Papoff understood the "insidious process" to include urethral involvement and/or lymph node involvement and metastasis. (Doc. 292 at 43.) Moreover, Dr. Papoff knew from Mr. Cherry's medical records that Mr. Cherry had experienced multiple recurring penile lesions, which "put him at great risk for urethral involvement." (Doc. 291 at 80.) At the April 2012 appointment, Mr. Cherry presented with a punctate lesion at the top of his meatus and erythema on the side of the meatus. Mr. Cherry also told Dr. Papoff that he had experienced a splayed stream for the past five months.

Given these circumstances, the standard of care required that Dr. Papoff perform a cystoscopy to examine Mr. Cherry's urethra. In Dr. Papoff's own words, the cystoscopy is "one of the most basic tools that urologists have at their disposal." (Doc. 292 at 20.) Plaintiffs' expert Dr. Danoff agreed, calling the cystoscopy the "single most basic instrument of the urologist." (Doc. 291 at 106.) And Dr. Lynch, Defendant's expert urologist, testified cystoscopies are "common" and "[u]rologists live and die by the cystoscopy." (Doc. 302 at 118–19.) According to Dr. Danoff, "[a]nytime there is a lesion which is identified as carcinoma in situ which is adjacent to, abutting, surrounding the meatus, anything less than a urethroscopy would fall below the standard." (Doc. 291 at 105.) This is because "the head of the penis and the meatus . . . mak[e] up about 40 percent of the surface of the glans" and "almost any lesion on the 'tip of the penis' is suspect of involving at least the distal urethra." (Doc. 291 at 105–06.) Dr. Danoff further explained that Dr. Papoff's decision to order a CT scan was "beyond comprehension." (Doc. 291 at 111.) Ordering a CT scan demonstrated Dr. Papoff was concerned about metastatic penile cancer. If he was concerned about metastasis, then Dr. Papoff should

---

[9] As further demonstration of his lack of credibility, Dr. Papoff dismissed Dr. Reardon's concern as dramatic, testifying that medical practitioners other than urologists view urology as "mystical." (Doc. 292 at 60.) It is also noteworthy that Dr. Papoff never contacted Dr. Reardon to ascertain exactly what was the nature of the concern.

have been even more concerned about urethral involvement and should have performed a cystoscopy. Moreover, Dr. Papoff himself admitted that if Mr. Cherry had reported a splayed stream for five months, he would have performed a cystoscopy because a recent change in urinary symptoms would have made him "concerned that there might be another lesion in the urethra leading to his malignancy or perhaps some other pathology[.]" (Doc. 292 at 22.)

Defendant points to the testimony of Dr. Donald Lynch in arguing that Dr. Papoff's treatment did not fall below the standard of care. (Doc. 309 at 8.) However, that testimony wrongly assumed the accuracy of Dr. Papoff's version of the events: that Mr. Cherry reported he had a splayed stream for five years, Dr. Papoff conducted a careful examination of Mr. Cherry's penis that included everting the meatus and palpating the penis, and Dr. Papoff's examination did not reveal abnormal findings. (Doc. 302 at 37–38.) According to Dr. Lynch, a cystoscopy was not indicated assuming Dr. Papoff performed a physical examination of Mr. Cherry's penis and "there were no findings physically at the time to suggest that there was pathology there that needed further evaluation." (Doc. 302 at 38.) Dr. Lynch further testified that if Mr. Cherry had reported a splayed stream for five months, then he too would have proceeded with a cystoscopy. (Doc. 302 at 44.) Because the Court finds Dr. Papoff's testimony was not believable, that Mr. Cherry reported a splayed stream of five months, and that Dr. Papoff did not observe normal findings after conducting a physical examination of Mr. Cherry's penis, Defendant's argument fails.

**B. Causation**

### 1. The Penectomy

Dr. Papoff's failure to perform a cystoscopy in April 2012 caused Mr. Cherry's penectomy in March 2013 and his and his wife's injuries. Under Arizona law, "the plaintiff must prove that the breach probably caused the injuries." *Massara*, 2015 WL 12516695, at *5–6. "The proximate cause of an injury is that which, in a natural and

continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred." *Id.*

A cystoscopy would more probably than not have revealed a lesion within Mr. Cherry's urethra in April 2012. Dr. Danoff testified to a reasonable degree of medical probability that had a cystoscopy been performed in April 2012, "a lesion within the urethra would have been identified."[10] (Doc. 291 at 99.) According to Dr. Danoff, Mr. Cherry's report of splayed stream implied "something within the urethra, the distal urethra, which is affecting the flow." (Doc. 291 at 111.) The splayed stream, in addition to the punctate lesion at the top of Mr. Cherry's meatus and erythema to the side, indicated urethral involvement that would have been detected by a cystoscopy. The Court need not determine whether the urethral lesion was a de novo lesion or spread from previous external lesions. As Dr. Danoff testified, Mr. Cherry had "urethral invasion" at the "end of the day," so "whether it's multifocal, whether it's extension . . . is irrelevant to the outcome." (Doc. 291 at 102.)

If the urethral lesion had been detected in April 2012, Mr. Cherry's penectomy could have been avoided through the use of penile-sparing procedures. Dr. Danoff testified to a reasonable degree of medical probability that in April 2012, discovery of a urethral lesion would have necessitated treatment options that were not as invasive as a partial penectomy. (Doc. 291 at 99.) Such treatment options included laser extirpation or extirpative surgery through "a ventral split by opening the urethra, the meatus on the ventral side." (Doc. 291 at 99.) Dr. Danoff further testified that the penile-sparing procedures would have had a "minimal" impact on Mr. Cherry's sexual function because they would have preserved the glans of the penis. (Doc. 291 at 100.) Their impact on Mr. Cherry's urinary function would also have been significantly less than that of a penectomy. (Doc. 291 at 100.)

---

[10] The Court finds Dr. Danoff to be eminently qualified, credible, and persuasive. He graduated from Yale Medical School, received specialty training in urology at Columbia Presbyterian, practiced urologic surgery for approximately 50 years, and founded the Cedar Sinai Medical Center Tower Urology Group. (Doc. 291 at 71–73.)

Defendant argues that even if a cystoscopy had been performed in April 2012, it probably would not have shown any abnormalities. Defendant again relies on the opinion of Dr. Lynch, who testified that a cystoscopy in April 2012 would have revealed a "normal finding." (Doc. 303 at 26.) As noted above, however, Dr. Lynch assumed that Dr. Papoff's version of the events was accurate, and the Court simply does not believe Dr. Papoff. For example, Dr. Lynch testified that if Dr. Papoff's physical examination had revealed normal findings, a cystoscopy probably would not have found abnormalities. (Docs. 303 at 26; 309 at 9.) Of note, even Dr. Lynch admitted that if Mr. Cherry had reported a splayed stream for five months, then "there may be something going on in the urethra." (Doc. 302 at 44.) Accordingly, Defendant cannot rely on Dr. Lynch's opinion to argue a cystoscopy would not have found abnormalities in April 2012.

Defendant grossly misrepresents Dr. Danoff's testimony to suggest he was uncertain about what a cystoscopy would have revealed in April 2012. (Doc. 309 at 10.) Dr. Danoff's statement that he was "not speculating as to what he would see, other than to say it is more likely than not he would see some abnormality," was made in response to a question about what a cystoscopy would have revealed in January 2010—when Mr. Cherry first presented with a penile lesion—and not in April 2012, the relevant time period here. (Doc. 291 at 107.) Dr. Danoff unequivocally stated a cystoscopy would have revealed a "lesion within the urethra" in April 2012. (Doc. 291 at 99.)

Defendant also argues that given the rapid growth of the tumor, which Dr. Ferrigni described, one cannot "infer from the fact that Mr. Cherry presented with visible disease in his urethra in November 2012, that the disease was present in April or June 2012." (Doc. 309 at 10.) Defendant's argument once again misstates trial testimony. Dr. Ferrigni, who was called by Defendant, testified that "viral-induced low grade squamous cell carcinomas can actually *externally* progress very rapidly into very impressive lesions." (Doc. 291 at 22 (emphasis added).) In addition, he explicitly testified that rapid external growth "does not necessarily tell us that it was growing rapidly within the

urethra." (Doc. 291 at 60.) Defendant incorrectly concludes from this testimony about external growth that the disease's internal growth was rapid as well. Further, Defendant does not point to any expert testimony supporting its hypothesis that Mr. Cherry's internal lesion grew so rapidly that it would have been undetectable in April 2012.

Defendant argues in the alternative that even if a lesion was detected in April 2012, Mr. Cherry's penectomy would have been unavoidable. (Doc. 309 at 11.) Defendant cites Dr. Lynch's testimony that if an April 2012 cystoscopy had found abnormalities, a penectomy would still have been the standard treatment. (Doc. 321 at 14.) However, Dr. Lynch based his opinion on the assumption that even if the cancer had been found approximately nine months earlier, it would exhibit "invasion to the extent that [it] exhibited in . . . January of 2013." (Doc. 302 at 85.) Any credible reason for this assumption is unclear, as Dr. Lynch also admitted that invasion happens over time and if the cancer had been caught at "a point prior to that depth of invasion," a penile-sparing surgery would have been within the standard of care. (Doc. 302 at 86.) The Court finds Dr. Lynch's opinion to be unpersuasive and internally inconsistent. Dr. Lynch testified that an April 2012 cystoscopy would have been too early to detect abnormalities, but *if* the cystoscopy had detected abnormalities, it would have been too late and the cancer would have already been sufficiently invasive to necessitate a penectomy. Given that invasion happens over time, Dr. Lynch did not credibly explain why he assumed the depth of invasion would have remained unchanged between April 2012 and January 2013. Dr. Danoff, by contrast, credibly and logically explained that a penectomy could have been avoided if the cystoscopy had been performed at an earlier date. Finally, Defendant argues "the penectomy is a more effective treatment [than penile-preserving procedures] because it removes the portion of the urethra capable of developing SCC, more directly addressing the risk of future SCC lesions arising in the urethra from the field effect." (Doc. 309 at 11.) This argument is meritless. Of all the operations done by urologists, there is no other procedure that is "more psychologically, physiologically, mentally, anatomically devasting" than a penectomy. (Doc. 291 at 79.) It is irrational to

conclude that merely because a penectomy will eliminate the possibility of recurrence, such a procedure should be performed even when it is avoidable and less disastrous procedures are available.

## *2. Lung Cancer*

Dr. Papoff's failure to perform a cystoscopy did not cause Mr. Cherry's lung tumor. Plaintiffs have not established to a reasonable degree of medical probability that Mr. Cherry's lung cancer was metastatic penile cancer that spread to his lung, rather than primary non–small cell lung cancer. (Doc. 309 at 12.)

First, Mr. Cherry's penile cancer was of the type that "almost never will metastasize." (Doc. 291 at 23.) Dr. Ferrigni, the surgeon who performed Mr. Cherry's penectomy, testified: "[T]he verrucous[11] cancers, which is what Mr. Cherry had, low grade, do not have a history of metastasizing. As a matter of fact when they do it it's practically a reportable case. I've never seen one." (Doc. 291 at 63.) Second, penile cancers that metastasize typically follow a pattern of progression; they "first spread to regional lymph nodes in the groin, then deep pelvis, then . . . retroperitoneum, and then to . . . lung, liver." (Doc. 309 at 12.) Dr. Ferrigni testified he monitored Mr. Cherry for five years after his penectomy and never observed involvement of the inguinal[12] and pelvic lymph nodes. (Doc. 309 at 12.) Without evidence of regional lymph node involvement, it is even more unlikely that Mr. Cherry's penile cancer spread to his lung. (Doc. 303 at 49.) Third, a number of clinical features indicate the lung lesion was more likely primary lung cancer. Dr. Raymond Taetle, Defendant's expert oncologist, testified that Mr. Cherry's lung cancer was "more probably than not . . . a primary lung tumor," because of "the small size of the location, its location in the upper lobe, the spiculated[13] appearance of the tumor . . . its drainage to lymph nodes, which would have been characteristics of a primary tumor." (Doc. 303 at 46.) Fourth, smoking is the number

---

[11] "Verrucous" is defined as "warty," in reference to the warts that are created by HPV. (Doc. 291 at 26.)

[12] "Inguinal lymph nodes" refer to lymph nodes of the groin. (Doc. 291 at 17.)

[13] "Spiculated appearance" refers to a "starburst shape" that is more common in primary tumors. (Doc. 303 at 47.)

one risk factor for developing primary non–small cell lung cancer, and Mr. Cherry testified that he smoked a pack of cigarettes a day for almost his entire adult life. (Doc. 301 at 20.) To support their argument that Mr. Cherry's lung lesion was metastatic penile cancer, Plaintiffs primarily rely on the fact that both his penile lesion and lung lesion tested positive for p16, a protein proxy for HPV. (Doc. 317 at 16.) However, as Drs. Taetle and Amin testified, p16 positivity is not a reliable proxy for HPV in the lung, because there are other pathways in which p16 can be "expressed without the intervention of HPV sequences." (Doc. 303 at 62; 304 at 68.)

The Court recognizes that Dr. Singh has treated and continues to treat Mr. Cherry for metastatic penile cancer. However, in light of credible and persuasive expert testimony that Mr. Cherry's lung tumor was more likely primary lung cancer, the Court cannot conclude to a reasonable degree of medical probability that Mr. Cherry's lung tumor was caused by metastasis from his penile cancer.

### C. Damages

Under Arizona law, "a plaintiff in a tort action is entitled to recover such sums as will reasonably compensate him for all damages sustained by him as the direct, natural and proximate result of such negligence, provided they are established with reasonable certainty." *Nunsuch ex rel. Nunsuch v. United States*, 221 F. Supp. 2d 1027, 1034 (D. Ariz. 2001) (citations omitted). As such, Plaintiffs are entitled to damages associated with the penectomy but not with the lung tumor.

"Arizona allows unlimited recovery for actual damages, expenses for past and prospective medical care, past and prospective pain and suffering, lost earnings, and diminished earning capacity." *Nunsuch*, 221 F. Supp. 2d at 1034 (citations omitted). Mr. Cherry seeks non-economic damages for pain, suffering, emotional anguish, loss of physical and sexual function, disfigurement, and loss of enjoyment of life. Mrs. Cherry seeks damages for loss of consortium. Plaintiffs do not seek damages for medical expenses or lost wages. Arizona courts draw a distinction between "general pain and suffering damages," which "compensate the injured person for the physical discomfort

and the emotional response to the sensation of pain caused by the injury itself," and "hedonic damages," which "compensate for the limitations . . . on the injured person's ability to participate in and derive pleasure from the normal activities of daily life, or for the individual's inability to pursue his talents recreational interests, hobbies, or avocations." *Ogden v. J.M. Steel Erecting, Inc.*, 31 P.3d 806, 813 (Ariz. Ct. App. 2001).

The Court concludes damages of $3,000,000.00 for Mr. Cherry's pain, suffering, anguish, disfigurement, and loss of enjoyment of life are fair and reasonable. As a result of Dr. Papoff's failure to perform a timely cystoscopy, Mr. Cherry underwent a partial penectomy and lost approximately three-fourths of his penis. (Doc. 301 at 22.) What remains of his penis is not sexually functional and Mr. Cherry no longer has a sexual relationship with his wife, which has affected him "dearly." (Doc. 293 at 38.) Mr. Cherry testified that he has a number of urinary problems because of the penectomy, and they have caused him to urinate on himself. He also testified to the severe psychological impact of the penectomy, describing his depression, anxiety, poor body image, and humiliation. For Mr. Cherry, the loss of a significant portion of his penis represented a loss of his manhood and dignity. Defendant's efforts to mitigate his damages are unpersuasive. It is obvious, to even the medically uninformed, that a penectomy is a devastating procedure. The Court further concludes damages of $750,000.00 for Mrs. Cherry's loss of consortium are fair and reasonable. Mrs. Cherry testified that it is "impossible" to have a sexual relationship with Mr. Cherry after his penectomy. (Doc. 301 at 88.) Further, Mrs. Cherry testified that their marriage has suffered because Mr. Cherry has become further withdrawn and depressed as a result of the penectomy.

Accordingly,

**IT IS ORDERED** finding for Plaintiffs and against Defendant, and that Plaintiffs shall take judgment for $3,750,000.00.

**IT IS FURTHER ORDERED** Defendant's Oral Motion for Judgment on Partial Findings is **DENIED AS MOOT**.

…

**IT IS FURTHER ORDERED** Plaintiffs' Motion for Expedited Hearing (Doc. 264) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** the Clerk of Court shall enter judgment in accordance with this Order.

Dated this 15th day of August, 2019.

Honorable Roslyn O. Silver
Senior United States District Judge